**Michael Edward BROOKS, Petitioner,**

v.

**N.C. DEPARTMENT OF CORRECTION, Respondent.**

No. 5:96–HC–752–BR2.

United States District Court, E.D. North Carolina, Western Division.

Sept. 25, 1997.

G. Alan DuBois, Raleigh, NC, for Petitioner.

Teresa L. Harris, Assoc. Atty. Gen., Raleigh, NC, for Respondent.

*ORDER*

BRITT, District Judge.

On 25 August 1997, Magistrate Judge Alexander B. Denson filed his Memorandum

and Recommendation (M & R) in the above-captioned case in which he recommended that respondent's motion for summary judgment be denied, that the petition for writ of habeas corpus be granted, and that petitioner's conviction be vacated. Respondent filed objections to the M & R on 17 September 1997 contesting Magistrate Judge Denson's M & R as to: (1) certain factual findings therein; (2) the failure to apply the doctrine of procedural bar: (3) the conclusion that N.C. Gen.Stat. § 14–223 impermissibly criminalizes protective speech, and; (4) the conclusion that N.C. Gen.Stat. § 14–223 was unconstitutionally applied to petitioner.

The court has conducted the required *de novo* review of the M & R, paying specific attention to the portions of the M & R to which respondent objected. Respondent's objections are without merit, and the same are hereby, OVERRULED. The court ADOPTS the well-reasoned M & R of Magistrate Judge Denson as its own and, for the reasons stated therein, respondent's motion for summary judgment is DENIED, the petition for writ of habeas corpus is GRANTED, and petitioner's conviction is VACATED.

## MEMORANDUM AND RECOMMENDATION

DENSON, United States Magistrate Judge.

THIS CAUSE comes before the court on Respondent's motion for summary judgment on Petitioner's application for writ of habeas corpus filed under 28 U.S.C. § 2254. This matter was initially referred to the undersigned on March 11, 1997. After reviewing the file, the undersigned concluded that this petition presented a substantial constitutional question and appointed counsel for Petitioner. The undersigned also ordered the parties to submit additional briefing on several issues. They have done so, and this matter is therefore ripe for ruling.

### I. *Background*

On August 31, 1994, Petitioner was convicted of Delaying and Obstructing a Public Officer in violation of N.C. Gen.Stat. § 14–223 (1993) after a jury trial in the Superior Court of Pasquotank County, North Car-

olina. The facts surrounding his conviction are as follows.

On February 6, 1994, officers of the Elizabeth City Police Department responded to an armed robbery complaint near the Debrier Housing Projects in Elizabeth City, North Carolina. After Officer Aubrey Sample arrived at the residence of the alleged victim, Tavarus Crutch ("Tavarus"), he received a second call reporting a fight nearby. He told Tavarus to stay at home until he returned and went to investigate the fight. Officer Sample was the first police officer to arrive at the scene. As he was speaking to a group of people, he saw a crowd running toward the intersection of Carver Street and Winston Street.

Officer Sample radioed for assistance and walked over to the crowd, where he saw that Wesley Crutch ("Wesley"), Tavarus's cousin, was beating Torrace Rogers, the alleged robber, as Rogers lay on the ground. Officer Sample and Officer Mark Byrum, who had also arrived on the scene, broke up the fight and took Rogers and Wesley into custody. The crowd, which consisted mostly of children and teenagers, told the officers that they had arrested the wrong man and allegedly screamed death threats and racial slurs at Rogers. Fearing for Rogers' safety, Officers Sample and Byrum attempted to keep the crowd under control. Soon thereafter, approximately seven to ten law enforcement officials, including police officers, sheriff's deputies, and a marine fishery officer, arrived as backup. At the beginning of this confrontation, Petitioner, who lives on Carver Street near the Winston Street intersection, was at home asleep in preparation for working the night shift as a correctional officer at nearby Currituck Correctional Facility. After being awakened by the noise, Petitioner went outside to see what was happening.

Once police and sheriff backup arrived, the officers continued to try to bring the crowd, which was still voicing its anger toward Rogers, under control. Tavarus had come to the scene and twice ran toward Rogers, who was still in Officer Sample's custody. Each time, Officer Sample told him to go away, and he complied. On the third time that Tavarus approached, he accused Rogers of robbing

him and allegedly threatened to kill him. There was a dispute as to what Officer Sample said in response to Tavarus's statements. According to Officer Sample's testimony and that of several other officers, he told Tavarus, "why in the hell didn't you stay home, like I told you to?" On the other hand, Petitioner testified that Officer Sample said that Tavarus should "take his mother fucking black ass back over in the project somewhere."[1] Petitioner's version was corroborated by his cousin, Brenda Willis, who was in the vicinity of the disturbance.

After overhearing Officer Sample's comments, Petitioner, a minister and leader of a community organization, became upset at what he perceived to be the officer's use of profanity toward Tavarus, who was thirteen years old at the time. His subsequent actions and statements were heavily disputed at trial, and are discussed more fully below. The police officers generally testified that Petitioner began loudly complaining to them about Officer Sample's statement to Tavarus. He was told to file any complaint he had at the police station and was repeatedly asked to leave, but refused and became more agitated, insisting that they would have to arrest him. The police lieutenant at the scene and another officer accepted Petitioner's invitation. They each grabbed one of Petitioner's arms, placed him against the trunk of the patrol car, and handcuffed him. They then walked him up Carver Street to a patrol car and, when he refused to get into the car, they placed him there forcibly by using an abdominal knee thrust.

Petitioner was convicted and sentenced to four to six months' imprisonment, but his sentence was suspended and he was placed on two years' unsupervised probation. He was also ordered to pay a $300 fine and to complete 72 hours of community service. He appealed to the North Carolina Court of Appeals on the grounds that the charging document did not allege that the officers were performing an official duty at the time of his alleged offense. That court found no error on August 1, 1995, and his petition for

discretionary review to the North Carolina Supreme Court was denied on October 5, 1995. Petitioner then filed a *pro se* motion for appropriate relief on May 31, 1996, alleging that N.C. Gen.Stat. § 14–223 violates the First and Fourteenth Amendments and that he received ineffective assistance of counsel at trial and on appeal. This motion was denied on June 27, 1996. He filed a petition for writ of certiorari in the North Carolina Court of Appeals seeking review of the denial of his motion, but that court denied the petition on July 19, 1996. He then brought this action on August 28, 1996.

## II. *Analysis*

Respondent now moves the court to enter summary judgment in its favor on the grounds that Petitioner's claims fail as a matter of law. Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must come forward and demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact that requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

### A. *"In Custody" and Mootness*

Before addressing the merits of Petitioner's claims, the court must determine whether Petitioner was "in custody" at the time he filed this petition and whether his subsequent unconditional release from proba-

---

1. Petitioner stated at trial that officer Sample told Tavarus to take his " 'm' 'f' black 'a' " back to the projects, but he so testified when his attorney asked him to abbreviate the words offi- cer Sample allegedly used. The court deems it appropriate to use the explicit language here in order to make clear its offensive nature.

tion moots this action. The first inquiry is jurisdictional. "The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are '*in custody* in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 490, 109 S.Ct. 1923, 1925, 104 L.Ed.2d 540 (1989) (per curiam) (quoting 28 U.S.C. § 2241(c)(3)) (emphasis in original); see 28 U.S.C. § 2254(a). A habeas petitioner must be in custody "at the time his petition is filed," or the court is without jurisdiction to hear his petition. *Maleng*, 490 U.S. at 490, 109 S.Ct. at 1924–25.

■ The Supreme Court has not taken a literal view of the "in custody" requirement, observing that "besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." *Jones v. Cunningham*, 371 U.S. 236, 240, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963) (holding that persons released from incarceration on parole are "in custody" under 28 U.S.C. § 2241). Like parolees, probationers are also subject to "restraints not shared by the public generally," and should therefore be considered "in custody" for habeas corpus purposes.[2] *Tinder v. Paula*, 725 F.2d 801, 803 (1st Cir.1984).[3] Thus, although Petition-

er was never in physical custody, he nonetheless was "in custody" under the habeas statutes when he filed this action.[4]

■ Petitioner's release from restraint after filing this petition does not nullify his custodial status. *Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 1559–60, 20 L.Ed.2d 554 (1968) ("[O]nce the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application."). However, a separate inquiry from the jurisdictional issue is whether Petitioner's unconditional release from probation moots his petition. An action is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Leonard v. Hammond*, 804 F.2d 838, 842 (4th Cir.1986) (citations and internal quotations omitted). The sole remedy in habeas corpus review of state court convictions is the invalidation of the conviction that placed the petitioner in custody. Therefore, in most cases, "unconditional release from state custody [ends] the controversy." *Broughton v. State of North Carolina*, 717 F.2d 147 (4th Cir.1983) (per curiam), *cert. denied*, 466 U.S. 940, 104 S.Ct. 1917, 80 L.Ed.2d 464 (1984).

■ Two exceptions to the mootness doctrine exist in the habeas corpus context: "(1) 'collateral consequences;' and (2) [cir-

**2.** Although Petitioner's status as an unsupervised probationer does not render him subject to many of the restraints that the Supreme court identified in *Jones*, 371 U.S. at 237, 83 S.Ct. at 374, he could nonetheless have been "rearrested at any time the [probation] officer believes he has violated a term or condition of his [probation]," and thereby forced to serve his suspended sentence. *Id.* at 242, 83 S.Ct. at 377.

**3.** In *McClenny v. Murray*, 33 F.3d 52, 1994 WL 465851, at *1, (4th Cir.1994) (unpublished), the Fourth Circuit, following *Tinder*, held that a habeas petitioner was "in custody" due to the restraints of his probation. However, the court subsequently reversed its holding upon rehearing and affirmed the district court's dismissal of the petition for lack of jurisdiction, concluding that the petitioner "failed to meet the 'in custody' requirement pursuant to § 2254(a) such that the district court had jurisdiction to entertain his petition." *McClenny v. Murray*, 51 F.3d 267, 1995 WL 113312, at *1 (4th Cir.1995) (unpublished).

Because the justification of the original opinion was that the petitioner was "in custody" as a result of his probation, the court's reversal can be seen only as holding that probation is insufficient to confer "in custody" status on a habeas petitioner, thereby conflicting with *Tinder*. Following *McClenny* would mean that the court is without jurisdiction to hear this petition. However, because that case was not published, it has no precedential value and does not bind this court. *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 408, 136 L.Ed.2d 321 (1996); Fourth Circuit Local Rule 36(c); Local Rule 5.04, EDNC. The undersigned finds *Tinder* more persuasive, especially in light of the conclusory nature of the Fourth Circuit's holding in *McClenny*.

**4.** Petitioner's timing was fortunate for him, indeed. He filed this petition on August 28, 1996, three days before his two year term of unsupervised probation was to expire.

cumstances] 'capable of repetition, yet evading review.'" *Leonard,* 804 F.2d at 842. Although the second exception does not apply in this case, Petitioner's unconditional release from probation will not moot this petition if collateral consequences give him a "'substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed.'" *Carafas,* 391 U.S. at 237, 88 S.Ct. at 1559 (quoting *Fiswick v. United States,* 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946)). In *Carafas,* the Court noted that the petitioner's felony conviction barred him from voting, pursuing certain occupations, and serving as a juror or labor union leader, and held these to be collateral consequences sufficient to render his petition not moot. *Id.* (citing various federal and New York statutes). In North Carolina, Petitioner's misdemeanor conviction does not prevent him from doing any of these things. *See Broughton,* 717 F.2d at 149 (citing federal and analogous North Carolina statutes).

However, the Fourth Circuit has expanded the list of collateral consequences from those originally identified in *Carafas.* In *Broughton,* the court held that where the conviction under attack may be used to enhance a sentence for a later conviction, a habeas petitioner retains a sufficient interest in his original conviction to prevent mootness. *Broughton,* 717 F.2d at 149. Respondent concedes that this petition is not moot for that reason, relying on N.C. Gen.Stat. § 15A–1340.4(a)(1)(*o*) (1988) (prior conviction for any offense punishable by more than 60 days imprisonment may be considered as an aggravating factor in sentencing for a subsequent offense). This statute was repealed when North Carolina adopted a structured sentencing scheme similar to the federal sentencing guidelines. *See* 1993 N.C. Sess. Laws ch. 538, § 14 (eff. Oct. 1, 1994).

The current sentencing statutes allow prior convictions to be counted toward a defendant's "Prior Record Level" for felony sentencing, or "Prior Conviction Level" for misdemeanor sentencing. N.C. Gen.Stat. § 15A–1340.14 (Supp.1996) (felonies); *Id.* § 15A–1340.21 (misdemeanors). The offense for which Petitioner was convicted is currently classified as a Class 2 misdemeanor, which may not be used to add "points" to a defendant's Prior Record Level for felony sentencing. *Id.* § 15A–1340.14(b). On the other hand, such a conviction will enhance a defendant's Prior Conviction Level, which could ultimately increase the range of possible imprisonment for a subsequent misdemeanor offense.[5] N.C. Gen.Stat. § 15A–1340.21; *Id.* § 15A–1340.23(c). All of this is to say that, at least insofar as subsequent misdemeanor convictions in North Carolina are concerned, there is a chance that any sentence Petitioner receives could be enhanced because of the conviction at issue in this petition.

■ In addition, the Fourth Circuit has held that the "possible refund of a fine" is a "collateral consequence constituting a sufficient stake in the outcome to prevent mootness." *Nakell v. Attorney General of North Carolina,* 15 F.3d 319, 322 (4th Cir.), *cert. denied,* 513 U.S. 866, 115 S.Ct. 184, 130 L.Ed.2d 118 (1994). Petitioner was assessed, and presumably paid,[6] a $300 fine upon conviction, and the potential for the return of this money is another collateral consequence that prevents this action from becoming moot by the expiration of his probation term.[7] In

---

5. As a concrete example, if the conviction at issue were Petitioner's only criminal conviction, and if he were subsequently convicted of another class 2 misdemeanor, the prior conviction would give him a Prior Conviction Level of II, thereby increasing the range of imprisonment for the later offense from 1–30 days to 1–45 days. N.C. Gen.Stat. § 15A–1340.23(c).

6. If he has not paid this fine, the petition is still not moot because he has an interest in avoiding future collection efforts by the state.

7. In *Nakell,* the court based its holding on an affidavit "stating that it is the customary proce-

dure of North Carolina courts to refund fines upon receiving notice that a conviction has been overturned." *Id.* It is unknown whether the North Carolina courts continue to follow this practice; if they do not, Petitioner's inability to receive a refund would negate this collateral consequence. In any event, allowing a habeas corpus action to proceed for the petitioner's hopes of receiving a refund of a fine does not seem entirely satisfactory; habeas corpus translates loosely as "show me the body," not "show me the money."

sum, because Petitioner faces the possibility, however slim, that a sentence for a subsequent misdemeanor conviction in North Carolina could be enhanced because of this conviction, and because he has paid, or is liable to pay, a fine that the state may choose to refund if he succeeds in overturning his conviction, there are collateral consequences that keep this action from becoming moot.

Petitioner may have barely achieved jurisdiction and narrowly warded off mootness, but he has done so nevertheless, and the court now turns to an analysis of his claims. He contends: (1) that N.C. Gen.Stat. § 14–223 is unconstitutional under the First Amendment, as applied to the states through the Fourteenth Amendment Due Process Clause, (2) that his attorney's failure to raise a First Amendment claim at trial or on appeal constituted ineffective assistance of counsel, (3) that there was insufficient evidence to support his conviction, and (4) that the trial judge erroneously instructed the jury on the applicable law governing this case.

### B. *First Amendment Claim*

Petitioner contends that his conviction violated the First and Fourteenth Amendments both because N.C. Gen.Stat. § 14–223 is overbroad on its face and because it was unconstitutionally applied to punish protected speech. Respondent argues that, because this claim was never advanced at trial or on direct appeal, it is procedurally barred from federal habeas review. This contention must be addressed before considering the merits of Petitioner's First Amendment challenge.

### 1. *Procedural Default*

■■■■ Because federal courts lack the power to "review a state law determination that is sufficient to support the judgment," a federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991). "This rule applies whether the state law ground is substantive or procedural." *Id.* In the habeas corpus context, a federal court may not review a petitioner's federal claims if a state court declined to address the substance of those claims because the petitioner failed to comply with a state procedural rule. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977). This so-called "procedural default" may be overcome by demonstrating cause for failing to adhere to a state procedural requirement and prejudice resulting from that failure, *Coleman*, 501 U.S. at 750, 111 S.Ct. at 2564–65; *Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506–07, or by establishing actual innocence. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

■■■■ However, before procedural default may be found, the state court must have actually denied a habeas petitioner's federal claims for failure to comply with a state procedural requirement. This question becomes muddied somewhat when a state court does not explicitly indicate whether it relies on state or federal law for its decision, and even more so where it issues a summary decision without any explanation of the rationale underlying its ruling. For this reason, the Supreme Court presumes in cases before it on direct review that no state law ground for a decision exists "when it is not clear from the opinion itself that the state court relied upon an adequate and independent state ground and when it fairly appears that the state court rested its decision primarily on federal law." *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3477, 77 L.Ed.2d 1201 (1983). The Court instructed other federal courts to follow this presumption in habeas corpus cases in *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Not only must the state court " 'have actually relied on the procedural bar as an independent basis for its disposition of the case,' " *id.* at 261–62, 109 S.Ct. at 1042 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985)), but "any ambiguities in that regard must be resolved by application of the *Long* standard," *id.* at 262, 109 S.Ct. at 1042, which requires that the state court opinion "contain[ ] a "plain statement" that [its] decision rests upon adequate and independent state grounds.' " *Id.* at 261, 109 S.Ct. at 1042

(quoting *Long,* 463 U.S. at 1042, 103 S.Ct. at 3477).

■ Petitioner did not advance his First Amendment claim at trial or on direct appeal. He first contended that N.C. Gen.Stat. § 14–223 violates the First and Fourteenth Amendments in his motion for appropriate relief filed in Superior Court under N.C. Gen.Stat. § 15A–1415. Without requiring the state to answer or holding a hearing, that court denied his motion on June 27, 1996, stating that "Defendant's motion is without merit in that the allegations therein set forth no probable grounds for the relief requested in law or in fact." (Order Denying Mot. for Approp. Relief, at 2.)[8] The question is therefore whether this order denied Petitioner's First Amendment claim on its merits or on procedural grounds. Respondent urges this court to find that the Superior Court denied Petitioner's motion under N.C. Gen. Stat. § 15A–1419(a)(3) (1988) (listing as grounds for denial of the motion that "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so").[9]

The Fourth Circuit has had some experience in deciding whether orders summarily denying motions for appropriate relief in North Carolina rely on procedural or substantive grounds. In *Nickerson v. Lee,* 971 F.2d 1125, 1128 (4th Cir.1992), *cert. denied,* 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681[*] (1993), the court interpreted an order in which the court simply stated that "the petitioner has set forth no grounds for which he is entitled to a motion for appropriate relief." Conceding that the motion could have been denied on procedural grounds under the North Carolina statute, the court nonetheless found " 'good reason to question whether there is an independent and adequate state ground for the decision' " because the language of the order hinted that the court denied his claims on their substantive merits. *Id.* at 1128–29 (quoting *Coleman,* 501 U.S. at 739, 111 S.Ct. at 2559).

Subsequently, the court, sitting en banc, addressed an order that merely stated that the petitioner's claims "set forth no probable grounds for relief." *Smith v. Dixon,* 14 F.3d 956, 960 n. 1 (4th Cir.) (en banc), *cert. denied,* 513 U.S. 841, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994). However, the court split evenly on this issue,[10] and the majority reversed the district court's grant of habeas relief because the jury instruction at issue was harmless error even if the claim were not procedurally barred. *Id.* at 982. As a decision by an evenly divided court, *Smith* affirmed the dis-

---

**8.** Petitioner then petitioned the North Carolina Court of Appeals for review of this order, but that court denied certiorari on July 19, 1996. Accordingly, the last and only state court to have considered his First Amendment claim is the Superior Court, and it is there that this court must look to determine whether it is procedurally defaulted. *See Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557.

**9.** The version of this statute applicable at the time Petitioner filed his motion included procedural waiver as grounds for denial of a motion for appropriate relief, but allowed the courts broad discretion in ruling on such motions on substantive grounds notwithstanding a waiver. N.C. Gen.Stat. § 15A–1419(b) (1988). The statute now mandates the denial of motions for appropriate relief on procedural grounds if possible unless the movant demonstrates cause and prejudice or a fundamental miscarriage of justice. N.C. Gen.Stat. § 15A–1419(b) (Supp.1996). This amendment became effective on June 21, 1996, six days before the Superior court denied Petitioner's motion, but more than three weeks after the motion was filed.

However, the court need not decide whether this amendment was intended to apply retroactively to all motions pending on June 21, 1996, or prospectively to all motions filed on or after that date, as Respondent does not argue the mandatory nature of the amended statute in support of its procedural bar argument. (*See* Resp.'s Mem. in Supp. of Summ. J., at 8–10.) Moreover, even if this amendment were retroactive, which is a matter for the North Carolina courts to decide, in order to preclude federal review of a claim due to procedural default, the superior court still must have stated "clearly and expressly that [its decision] [wa]s ... based on bona fide separate, adequate, and independent grounds.' " *Coleman,* 501 U.S. at 733, 111 S.Ct. at 2556 (quoting *Long,* 463 U.S. at 1041, 103 S.Ct. at 3476). It did not do so.

**10.** The published opinion in *Smith* does not indicate this split, and the portion of the published opinion finding a procedural bar contains key note numbers, which are ordinarily reserved for controlling points of law. However, the Fourth Circuit later clarified that the *Smith* court was evenly divided on the procedural bar issue in *Ashe v. Styles,* 39 F.3d 80, 86 n. 4 (4th Cir.1994).

trict court's ruling that the petitioner's claims were not procedurally barred, but may not be cited as controlling precedent on the procedural bar issue. *See Ashe v. Styles,* 39 F.3d 80, 86 n. 4 (4th Cir.1994).

Thus, Respondent's reliance on *Smith* for its assertion that Petitioner's First Amendment claim is procedurally barred is misplaced, and the court must follow *Nickerson* instead. There, the state court denied the petitioner's motion because it " 'set forth no grounds for which he is entitled to a motion for appropriate relief.' " *Nickerson,* 971 F.2d at 1128. Here, it did so because Petitioner's allegations "set forth no probable grounds for the relief requested in law or in fact." The "relief requested" in Petitioner's motion for appropriate relief is a new trial or dismissal of the charges on the grounds that N.C. Gen.Stat. § 14–223 is unconstitutional. To find "no probable grounds" for this relief suggests that the court concluded that his claims were substantively meritless, especially where the order does not expressly invoke any state procedural bar.

Moreover, "[t]his is not a case like *Coleman,* in which the meaning of the order can be determined from the pleadings." *Id.* There, the Court examined a decision of the Virginia Supreme Court summarily granting the state's motion to dismiss the petitioner's appeal for failure to comply with Virginia's thirty day notice of appeal provision. *Coleman,* 501 U.S. at 727–28, 111 S.Ct. at 2553. "[A]lthough the order [in *Coleman* ] was unexplained, the nature of the disposition ('dismissed' rather than 'denied') and surrounding circumstances (in particular the fact that the state had rested its argument entirely on a procedural bar), indicated that

the basis [of the order] was procedural default." *Ylst v. Nunnemaker,* 501 U.S. 797, 802, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991).

In contrast, the order here was issued without a response from the state or a hearing, and this court cannot ascertain from the pleadings whether the Superior Court even considered imposing a procedural bar. Like the order in *Nickerson,* this order "neither mentions procedural default (or any synonymous term) nor cites any relevant North Carolina statutory or decisional law, [and] does not even note that the claims raised … in the underlying motion had not been raised in his previous direct... appeals." [11] *Nickerson,* 971 F.2d at 1129. Rather, it "implies that the court reached and reviewed the merits of each of [Petitioner's] claims and concluded that he would not be entitled to relief on any of these claims." *Id.* It therefore appears either "to rest primarily on … or to be interwoven with" the resolution of Petitioner's federal claims and does not "clearly and expressly rely on an independent and adequate state ground." *Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557. Petitioner's First Amendment claim is accordingly not procedurally defaulted, and the court shall review its merits.[12]

### 2. *Standard of Review*

Any substantive legal issue in this petition that was also addressed in state court must be analyzed in light of 28 U.S.C. § 2254(d), *as amended by* the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (the "AEDPA"), which reads as follows:

---

**11.** The order in this case mentions procedural default only prospectively, by barring any future claims Petitioner may attempt to bring under N.C. Gen.Stat. § 15A–1419 due to his failure to include them in his first motion for appropriate relief.

**12.** Even if this claim were procedurally barred, Petitioner could nonetheless obtain federal review by establishing "cause for the default and actual prejudice as a result of the alleged violation of federal law, or [by] demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565. Although ordinary attorney error does not constitute cause

for default, if an error deprived Petitioner of the effective assistance of counsel guaranteed by the Sixth Amendment, the requisite cause would be established. *Id.* at 752, 111 S.Ct. at 2566; *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Petitioner claims that his attorney's failure to raise a First Amendment issue at trial or on appeal was ineffective assistance of counsel, a contention that the court does not address because of the disposition of his First Amendment claim. However, the court would merely note that, even if a procedural bar were imposed here, it would not necessarily be insurmountable.

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

With respect to Petitioner's First Amendment claim, the only state court ruling to address the merits is the Superior Court's denial of his motion for appropriate relief. Although the Fourth Circuit has not addressed new § 2254(d), other circuits have attempted to define when a state court legal ruling must be "contrary to" Supreme Court caselaw, and when it must be the more demanding "unreasonable application of" that precedent for a writ of habeas corpus to issue. The Seventh Circuit has held that, by allowing a federal court to reverse a state court decision "contrary to" federal law, the law leaves federal courts "free to express an independent opinion on all legal issues in the case," albeit at the same time restricting them to applying Supreme Court decisions. *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir.1996) (en banc), *rev'd on other grounds*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The Fifth Circuit has held that the phrase "unreasonable application" speaks to mixed questions of law and fact. *Drinkard v. Johnson*, 97 F.3d 751, 767 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), *overruled in part on other grounds, Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Such issues call for a more restrained ap-proach. "[W]hen the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored." *Lindh*, 96 F.3d at 871. A federal court cannot substitute its own judgment for a reasonable State court ruling because "the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions." *Id.*

▉▉▉ The implication of new § 2254(d) for this petition is that, as a pure legal issue, N.C. Gen.Stat. § 14–223 is facially overbroad only if the Superior Court's decision that it is not is "contrary to … clearly established Federal law, as determined by the Supreme Court of the United States." On the other hand, the issue of the constitutionality of this statute's application to Petitioner's behavior is a mixed issue of law and fact. Taking the specific words Petitioner is alleged to have used, which is a question of fact, the court must exercise its independent judgment as to the legal issue of whether those words are protected by the First Amendment. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 505–06, 104 S.Ct. 1949, 1962–63, 80 L.Ed.2d 502 (1984). This issue will support habeas relief only if the Superior Court's ruling "involved an unreasonable application of clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1). With these parameters in mind, the undersigned now turns to the substance of Petitioner's First Amendment claim.

### 3. *Facial Overbreadth*

▉▉▉ Relying heavily on *City of Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), Petitioner claims that his conviction must be invalidated because, by criminalizing a substantial amount of protected speech, N.C. Gen.Stat. § 14–223 is facially overbroad.[13] Due to "the wide-reaching effects of striking down a statute on its face, … the overbreadth doctrine is 'strong medi-

---

**13.** The court rejects Respondent's suggestion that this claim is barred by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny, as a " 'new rule' of constitutional adjudication." (Resp.'s Mem. in Supp. of Mot. for Summ. J., at 18.) *Hill*, the primary, and most recent, case on which this claim is based, was decided in 1987, well before the events that gave rise to Petitioner's conviction.

cine' [that should be used] 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916–17, 37 L.Ed.2d 830 (1973)). For that reason, "[o]nly a statute that is substantially overbroad may be invalidated on its face." *Hill*, 482 U.S. at 458, 107 S.Ct. at 2508. Where, as here, a criminal statute or ordinance is concerned, "the standard of certainty is higher." *Kolender v. Lawson*, 461 U.S. 352, 358–59 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983). In such a case, courts should examine the statutory language "with particular care," and enactments "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Hill*, 482 U.S. at 459, 107 S.Ct. at 2508.

To determine whether the Superior Court's denial of Petitioner's motion for appropriate relief was contrary to *Hill* and other relevant Supreme Court caselaw, the court must review precedent concerning the extent to which a citizen's speech to a police officer may be punished constitutionally. This inquiry must begin with *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), where the Court upheld a New Hampshire statute that proscribed the use of "offensive, derisive or annoying word[s]" against First and Fourteenth Amendment attacks. It noted that "certain well-defined and narrowly limited classes of speech" exist whose "prevention and punishment ... have never been thought to raise any Constitutional problem." *Id.* at 571–72, 62 S.Ct. at 769 (footnotes omitted). These categories "include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572, 62 S.Ct. at 769. Because the New Hampshire Supreme Court had previously inter-

preted the statute at issue to prohibit only "fighting words," the Court held that it did not violate the First or Fourteenth Amendments either on its face or as applied.[14] *Id.* at 573–74, 62 S.Ct. at 770.

The Court reiterated the importance of the "fighting words" exception in *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). There, the issue was the facial constitutionality of a Georgia statute which made it unlawful to use "opprobrious words or abusive language, tending to cause a breach of the peace." The Court framed the question as whether the statute barred only fighting words, or whether it impermissibly covered a broader range of speech. Analyzing both the dictionary definitions of "opprobrious" and "abusive" and Georgia caselaw interpreting those terms, the Court held that the statute "applies ... to utterances where there was no likelihood that the person addressed would make an immediate violent response," and was therefore unconstitutional on its face. *Id.* at 528, 92 S.Ct. at 1109. After *Gooding*, it was clear that offensive or indecent speech is not constitutionally sanctionable unless the words used are likely to incite imminent violence on the part of others.

■ The fighting words exception developed in *Chaplinsky* and *Gooding* was first applied to speech directed at a police officer in *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), where the Court struck down a New Orleans ordinance that made it unlawful "wantonly to curse or revile or to use obscene or opprobrious language" toward a police officer on duty. The ordinance was doomed by its word choice, as the Court had interpreted "opprobrious" language as encompassing protected speech in *Gooding*. Relying on its view in *Gooding* that any law criminalizing speech that is not narrowly tailored to target

---

14. Admittedly, the statements that the supreme Court held to be fighting words in *Chaplinsky*, "you are a God damned racketeer" and "a damned Fascist," are considerably tamer than language that, in more recent cases, the Court has held not to be fighting words. *E.g., Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam) ("We'll take the fucking street later [or again]"); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ("Fuck the Draft" written on jacket). The distinction, as discussed more fully below, is that while the former language is a direct personal insult, the latter (and the language in this case) is not.

only fighting words is facially overbroad,[15] the Court invalidated the ordinance.[16]

The Court next addressed this area of First Amendment jurisprudence in *Hill,* where it invalidated a Houston ordinance that made it " 'unlawful for any person to assault, strike, or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty.' " *Hill,* 482 U.S. at 455, 107 S.Ct. at 2506. The Texas Penal Code forbids municipalities from enacting ordinances that punish activity prohibited by the Code. *Id.* at 460, 107 S.Ct. at 2508–09. Since a Texas statute already punished assaults on officers, "the enforceable portion of the ordinance ma[de] it 'unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty,' and thereby prohibit[ed] verbal interruptions of police officers." *Id.* at 461, 107 S.Ct. at 2509.

The Court first noted that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Id.* The Court then observed that the language of the ordinance in *Hill* was "much more sweeping than the municipal ordinance struck down in *Lewis.*" *Id.* at 462, 107 S.Ct. at 2510. Rather than penalize "fighting words," which the city could constitutionally accomplish, or even require some form of "obscene or opprobrious" language, which was held invalid in *Lewis* and *Gooding,* the ordinance in *Hill* prohibited "speech that 'in any manner . . . interrupt[s] an officer.' " *Id.* Because the ordinance "criminalize[d] a substantial amount of constitutionally protected speech, and accord[ed] the police unconstitutional discretion in enforcement," it was held to be substantially overbroad and invalidated on its face. *Id.* at 466, 107 S.Ct. at 2512.

Petitioner contends that this same analysis applies to N.C. Gen.Stat. § 14–223 (1993), which, at the time of his arrest, read as follows:

> If any person shall willfully and unlawfully resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00), imprisonment for not more than six months, or both.

From the face of this statute, it is not apparent whether it prohibits speech at all. The answer to that question depends on whether the North Carolina courts have interpreted the terms "resist, delay, or obstruct" to include speech directed at an officer. *Cf. Gooding,* 405 U.S. at 525–28, 92 S.Ct. at 1107–09 (examining statute's interpretation by state courts in order to determine its scope).

In *State v. Leigh,* 278 N.C. 243, 179 S.E.2d 708 (1971), the North Carolina Supreme Court parsed the language of § 14–223 in order to define what acts constitute resisting, delaying, or obstructing an officer. The court in large part adopted definitions propounded in dictionaries and legal hornbooks:

> In Webster's New International Dictionary the word "obstruct" is defined: "Hinder from passing, action, or operation; . . . to be or come in the way of"; and "delay" is defined, "to stop, detain, or hinder for a time; . . . to cause to be slower or to occur more slowly than normal." In Black's Law Dictionary "resist" is defined: "To oppose. This word properly describes an opposition by direct action and by *quasi* forcible means." "Obstruct" is defined: "To hinder or prevent from progress, check, stop,

**15.** Justice Powell, in a concurring opinion, argued that even "fighting words" may not be constitutionally punishable when directed toward a police officer, who might "reasonably be expected to 'exercise a higher degree of restraint, than the average citizen" when confronted with such language. *Lewis,* 415 U.S. at 135, 94 S.Ct. at 973 (Powell, J., concurring). The majority chose not to address this argument. *Id.* at 132 n. 2, 94 S.Ct. at 972 n. 2.

**16.** In so doing, the court made scarce reference to the facts involved in the petitioner's conviction. After a police officer stopped her and her husband, the petitioner allegedly said "you god damn m. f. police—I am going to [the superintendent of Police] about this." *Id.* at 131 n. 1, 94 S.Ct. at 971 n. 1. However, whether the actual words the petitioner uttered may be punished under a "properly limited statute or ordinance" is "immaterial" where a facial challenge is concerned. *Id.* at 133, 94 S.Ct. at 972.

also to retard the progress of, make accomplishment of difficult and slow."

In Wharton's Criminal Law and Procedure, Vol. 3, Obstructing Justice, Section 1284, pp. 633 and 634, it is stated:

"As a general rule, under statutes containing the words 'obstruct, resist, or oppose,' or 'resist, obstruct, or abuse,' or the single word 'resist' the offense of resisting an officer can be committed without the employment of actual violence or direct force, and without making threats. . . .

"To 'obstruct' is to interpose obstacles or impediments, to hinder, impede, or in any manner intrude or prevent, and this term does not necessarily imply the employment of direct force or the exercise of direct means."

*Id.* at 247, 179 S.E.2d at 710–11. The court also relied on its interpretation of a previous statute punishing those who "willfully interfere with or obstruct the officers of the State Board of Health," where it stated as follows:

"We do not hold that actual violence or demonstration of force is indispensable to such obstruction or interference. To 'interfere' is to check or hamper the action of the officer, or to do something which hinders or prevents or tends to prevent the performance of his legal duty; and to 'obstruct' signifies direct or indirect opposition or resistace [sic] to the lawful discharge of his official duty."

*Id.* at 247–48, 179 S.E.2d at 711 (quoting *State v. Estes*, 185 N.C. 752, 117 S.E. 581 (1923)). The court then noted that, although "the word 'resist' would infer more direct and forceful action," the words "delay' and 'obstruct' appear to be synonymous." *Id.* at 248, 179 S.E.2d at 711. Moreover, "since the words describing the act are joined by the disjunctive (or), the statute will apply to

cases falling within any one of the descriptive words." *Id.*

■ Following *Leigh,* the North Carolina courts have noted that no force or physical action is required to support a conviction under § 14–223. *E.g., State v. Downing,* 66 N.C.App. 686, 690, 311 S.E.2d 702, 704 (1984), *aff'd in part, rev'd in part on other grounds,* 313 N.C. 164, 326 S.E.2d 256 (1985); *State v. Kirby,* 15 N.C.App. 480, 489, 190 S.E.2d 320, 326, *appeal dism'd,* 281 N.C. 761, 191 S.E.2d 363 (1972).[17] The facts supporting the conviction in *Leigh* best illustrate this interpretation. There, a sheriff's deputy had been dispatched to investigate an assault complaint and sought to speak to Raymond Blount, who was sitting in Leigh's car. The deputy sheriff testified as follows:

I asked Blount to get out of the car and come on go with me and Leigh said "You don't have to go with that Gestapo Pig." . . . When [Blount] started toward my car, Leigh kept saying "You don't have to go with that Pig." . . . Blount got out of Leigh's car and walked straight to my car. I opened the door. Blount did not get right in because of Leigh interfering and telling him not to go. Leigh followed me over to my car. He was right behind me. He didn't prevent me from opening my door. He just kept interfering by teling [sic] Blount not to go with that Pig. . . .

*Leigh,* 278 N.C. at 246, 179 S.E.2d at 709–10. "Conceding that no actual violence or force was used by defendant," the court nonetheless found "sufficient evidence to support" his conviction under N.C. Gen.Stat. § 14–223. *Id.* at 249, 179 S.E.2d at 711.

After rejecting the defendant's First Amendment challenge,[18] the court then addressed his contention that the trial judge improperly instructed the jury because it "could have easily convicted [him] of the

---

17. Although the North Carolina Court of Appeals is not the highest court in North Carolina, federal courts may still follow its rulings in determining North Carolina law because it is a statewide court whose decisions bind all trial courts in the state unless a decision of the North Carolina supreme court dictates otherwise. *Gooding v. Wilson,* 405 U.S. 518, 525 n. 3, 92 S.Ct. 1103, 1108 n. 3, 31 L.Ed.2d 408 (1972).

18. The court rejected this argument by distinguishing the conduct forbidden by § 14–223 from that which the United States Supreme Court declared protected in *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), on the grounds that § 14–223 was content-neutral. *Leigh,* 278 N.C. at 250, 179 S.E.2d at 712. However, it did not consider whether the statute reached a broader segment of speech than fighting words.

mere exercise of free speech which is constitutionally protected." *Id.* at 251, 179 S.E.2d at 713. Outlining the elements of this offense, the court stated that:

> The general rule is that merely remonstrating with an officer in behalf of another, or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties.... It logically follows that a citizen may advise another of his constitutional rights in an orderly and peaceable manner while the officer is performing his duty without necessarily obstructing or delaying the officer in the performance of his duty.

*Id.* (citations omitted). Because the trial judge did not instruct the jury in accordance with these principles, the court reversed the defendant's conviction and ordered a new trial. *Id.* at 252, 179 S.E.2d at 713.

▉▉▉▉ Thus, under the North Carolina Supreme Court's interpretation of § 14–223, although words alone are sufficient to violate the statute, merely speaking to, remonstrating with, or even criticizing an officer during the performance of his duties is not prohibited if done "in an orderly and peaceable manner." *Id.* at 251, 179 S.E.2d at 713. The North Carolina Court of Appeals has applied this test on several occasions. In *State v. Singletary*, 73 N.C.App. 612, 615, 327 S.E.2d 11, 13 (1985) (emphasis added), the court noted that "communications intended merely to assert rights, clarify a misunderstanding, or gain information *in a peaceable or orderly manner* ... are not chilled." *See also Burton v. City of Durham*, 118 N.C.App. 676, 680, 457 S.E.2d 329, 332 (holding that § 14–223 does not reach "[c]ommunications simply

intended to assert rights, seek clarification or obtain information *in a peaceful way*") (emphasis added), *disc. review denied*, 341 N.C. 419, 461 S.E.2d 756 (1995).[19]

▉▉▉▉ The common thread underlying *Hill*, *Lewis*, and *Gooding* is that citizens may not be punished for vulgar or offensive speech unless they use words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769. Both *Lewis* and *Hill* extend this limitation to speech directed at police officers, which must be more than "obscene or opprobrious," and which must do more than "interrupt ... any policeman in the execution of his duty" to be constitutionally sanctionable. *Lewis*, 415 U.S. at 132, 94 S.Ct. at 972; *Hill*, 482 U.S. at 461, 107 S.Ct. at 2509.

As interpreted by the North Carolina courts, N.C. Gen.Stat. § 14–223 punishes speech directed at a police officer unless conveyed in an "orderly and peaceable manner." This interpretation is contrary to *Chaplinsky* because it punishes more than fighting words, *i.e.*, words that cause an imminent breach of the peace. It is also contrary to *Lewis*, which protects even "opprobrious" language directed at police officers so long as fighting words are not used,[20] and to *Hill*, which annulled an ordinance that was "not narrowly tailored to prohibit only ... fighting words." *Hill*, 482 U.S. at 465, 107 S.Ct. at 2511. As the Court stated in *Hill*, "the First Amendment recognizes, wisely we think, that a certain amount of expressive *disorder* not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *Id.* at 472, 107 S.Ct. at 2515 (emphasis added). Because an officer could con-

---

**19.** In both *Burton* and *Singletary*, the arrests under § 14–223 were caused primarily by speech as well. In *Burton*, the plaintiff in an action under 42 U.S.C. § 1983 was pulled over for speeding. while the officer was checking his registration over the radio, he "approached their patrol car and began questioning [the officer] repeatedly in a loud voice." *Burton*, 118 N.C.App. at 678–79, 457 S.E.2d at 331. After refusing to comply with the officer's demand that he stop speaking and return to his car, the plaintiff was arrested. In *Singletary*, the defendants were convicted after they advanced toward offi-

cers attempting to arrest another man, halted when the officers drew their weapons, and, with their fists in the air, shouted "no, no, no, he ain't going nowhere," and "stop it, he ain't going." *Singletary*, 73 N.C.App. at 613–14, 327 S.E.2d at 12.

**20.** In *Gooding*, the court defined "opprobrious" as "conveying or intending to convey disgrace," a "greater reach than fighting words." *Gooding*, 405 U.S. at 525, 92 S.Ct. at 1107 (quoting Webster's Third New International Dictionary (1961)).

sider speech that was not fighting words as disorderly or not peaceable, § 14–223 impermissibly criminalizes protected speech.[21]

However, a statute will not be invalidated as facially overbroad "merely because it is possible to conceive of a single impermissible application.'" *Id.* at 458, 107 S.Ct. at 2508 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 630, 93 S.Ct. 2908, 2925, 37 L.Ed.2d 830 (1973) (Brennan, J., dissenting)). It must cover "'a substantial amount of constitutionally protected conduct,'" *id.* (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)), before the "strong medicine" of facial invalidation will be employed. *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916–17. "[P]articularly where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2918.

"The hard question ... is how the substantiality of a statute's overbreadth ought to be gauged." Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 893 (1991). There can be no doubt that § 14–223 is capable of many legitimate applications. The language of the statute does not specifically target speech, and the vast majority of reported decisions involving this statute have involved some form of physical action, a point that even Petitioner concedes. (*See* Pet'r's Supp. Mem., at 19 & n. 8.) The *Broadrick* formulation appears to favor "geometric proportion, [involving a] comparison ... between the number of cases to which a court might constitutionally apply a statute, and the number of cases in which the statute's application would violate constitutional rights." Fallon, *supra*, at 894. Such analysis would almost certainly result in "uncabined judicial speculation," *id.*, as the court has no empirical data before it from which to answer this question.[22]

Fortunately, the court need not undertake this endeavor, as another principle comes into play in this case. "The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982). The "First Amendment overbreadth doctrine is one of the few exceptions to this principle," as "'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression.'" *Id.* at 768, 102 S.Ct. at 3361 (quoting *Gooding*, 405 U.S. at 521, 92 S.Ct. at 1105). "[F]or this reason, [the Supreme Court has] allowed persons to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *Id.* at 769, 102 S.Ct. at 3361.

However, "[i]t is otherwise where the parties challenging the statute are those who wish to engage in protected speech that the overbroad statute purports to punish." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985). "There is then no want of a proper

---

**21.** The terms "orderly" and "peaceable" allude to another problem mentioned in *Hill*. The Court has "repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Hill*, 482 U.S. at 465, 107 S.Ct. at 2511. Although words are rarely susceptible of mathematical definition, an officer's decision as to whether an individual is speaking in an "orderly" or "peaceable" manner necessarily involves some degree of subjectivity. As Petitioner points out, the testimony at his trial highlights the degree of discretion given to the arresting officer to judge the content of the speaker's statements. Officer Lacombe testified that he knew

Petitioner was a correctional officer, and because of that status, afforded him more leniency than he would another person who made the same comments. (Tr., at 94.)

**22.** As an example of the difficulty of this inquiry, the author cites *Massachusetts v. Oakes*, 491 U.S. 576, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989), in which Justices Brennan and Scalia agree that a certain statute is overbroad but reach opposite conclusions as to whether it is substantially so. *Compare id.* at 588–90, 109 S.Ct. at 2640–42 (Scalia, J., dissenting) *with id.* at 595–99, 109 S.Ct. at 2644–46 (Brennan, J., dissenting).

party to challenge the statute, no concern that an attack on the statute will be unduly delayed or protected speech discouraged. The statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.; accord Texas v. Johnson*, 491 U.S. 397, 403 n. 3, 109 S.Ct. 2533, 2539 n. 3, 105 L.Ed.2d 342 (1989) (declining to address facial challenge to Texas flag burning statute because fact that the defendant engaged in protected conduct was sufficient to reverse his conviction). If Petitioner was convicted in violation of the First Amendment, the statute need not be declared unconstitutional *in toto*, but only to the extent that it punishes protected speech. The court shall accordingly turn to Petitioner's challenge to the application of § 14–223 to the facts of his case.

### 4. *Constitutionality of N.C. Gen.Stat. § 14–223 as Applied*

Petitioner's second contention is that N.C. Gen.Stat. § 14–223 was unconstitutionally applied to him. The ultimate question is whether Petitioner's alleged actions and words can constitutionally support a conviction, or whether they are protected by the First Amendment. There was a sharp discrepancy at trial as to what Petitioner actually said to the police officers. Because it was a jury trial, there are no written findings of fact to resolve this dispute. Accordingly, the court shall summarize all testimony concerning Petitioner's actions and statements to the police officers in order to determine whether his alleged comments lack constitutional protection.

Officer Mark Byrum testified that, after the majority of the crowd had left the area as instructed, Petitioner was told to leave but remained and yelled, "you didn't have to say that to him." After another officer told Petitioner that he could file a complaint if he was unhappy with anything the policemen had done, Petitioner still refused to leave. Officer Byrum stated that Lieutenant J.C. Spear held his hand up toward Petitioner's chest, and Petitioner told him, "don't put your damn hands on me." According to Officer Byrum, Petitioner became "enraged," told another officer "that he was not going any

fucking where," and told Lieutenant Spear "that you would have to arrest me." Lieutenant Spear and Officer Alfred Sanderlin then placed Petitioner under arrest.

Officer Alfred Sanderlin testified that he saw Petitioner standing in the middle of a group of officers, gesturing toward Officer Sample. Officer Sanderlin saw Lieutenant Spear step in front of Petitioner and extend his hand out in front of Petitioner, after which Lieutenant Spear walked away to another area. Officer Sanderlin heard Petitioner say, "That's not right. That's no way to be." In response to Officer Jamie Lacombe telling him that he should file any complaint he had at the police station, Officer Sanderlin testified that Petitioner said, "I'm not going nowhere, you will just have to arrest me." Officers Malcolm Mouring and Ricky King each spoke to Petitioner, but he continued to be agitated and said loudly, "get away from me. I don't want to hear that," and "I'm not going nowhere. You'll have to arrest me." Officer Sanderlin stated that Lieutenant Spear then returned to the group and again warned Petitioner that he would be arrested if he did not leave. When he did not comply, he was arrested.

Officer Jamie Lacombe testified that, after Officer Sample told Tavarus, "why in the hell didn't you stay home," Petitioner said, "that's not right. You shouldn't say that." Officer Lacombe tried to calm Petitioner down, but he kept saying, "this is not right. What y'all are doing is not right." Officer Lacombe continued to ask Petitioner to leave and told him that he should file any complaint he had with the Lieutenant, but Petitioner refused. Officer Malcolm Mouring testified that he did not hear what Officer Sample said, but noticed that it upset Petitioner. Because Officer Mouring knew Petitioner, he went over to him and attempted to calm him down. After Officer Mouring asked him to leave, Petitioner responded, "no ... I don't like the way he talked to that child. He's only a child." Officer Mouring stated that Petitioner then told him in a loud voice to "get the hell away ... and don't touch me."

Officer Roger Jones testified that Petitioner stated very loudly, "he didn't have to talk to him like that." Officer Jones said that

after Petitioner refused to calm down, Lieutenant Spear held his hand outstretched toward Petitioner. Officer Jones also testified that Petitioner never attempted to hurt him or assault any police officer. Officer Ricky King testified that Petitioner said loudly, "he didn't have to talk to that kid that way, he was only a child." Officer King approached Petitioner and spoke to him in an attempt to calm him down and stated that he replied, "don't tell him what to do."

Lieutenant Spear testified that, after the officers had taken Rogers and Wesley into custody, he saw Petitioner in the crowd yelling, "this is not right. What y'all are doing is not right." Lieutenant Spear stated that as Petitioner approached the officers, he stepped in front of Petitioner, threw his left arm out in order to stop him, and Petitioner walked into his arm. Petitioner then allegedly told him to get his hands off of him and never to touch him again. Lieutenant Spear said that it was then that Tavarus approached the officers and Officer Sample said "why in the hell didn't you stay where I told you to," which contradicts the testimony of several other officers that Petitioner said nothing until Officer Sample spoke to Tavarus. According to Lieutenant Spear, Petitioner then yelled at Officer Sample, chiding him for speaking to Tavarus in that manner. Lieutenant Spear testified that he left the area where Petitioner was to assist in controlling the crowd, and when he returned, Petitioner had not stopped complaining. Lieutenant Spear saw Officer Lacombe trying to pacify Petitioner without success and heard Petitioner say that he wasn't going anywhere. Lieutenant Spear stated that he said "yes you are. You're going with us," upon which he and Officer Sanderlin arrested Petitioner.

Petitioner's testimony differs in several material respects. He stated that, after being awakened by the crowd, he walked out into his yard and watched the crowd from approximately 75 feet away for fifteen minutes. He stated that he saw Officer Sample

use profanity toward Tavarus, telling him to "take his mother fucking black ass back over in the project somewhere." He then walked to between six and ten feet away from Officer Sample and told him that he didn't "have to use profanity against those children." Petitioner testified that Officer Sample said nothing in return, but that Lieutenant Spear approached, put his hand up, and then walked away. Petitioner said that he stated over and over again that Officer Sample did not have to use profanity against children.

Officers Lacombe, Mouring, and King told Petitioner that they understood what he was saying and that he should file a complaint through the police department. Petitioner stated that he repeated his concerns and that, as he was walking away, he was arrested. Petitioner testified that he never heard any officers telling him to leave the area and the only thing he ever said to any police officer was that Officer Sample was wrong for using profanity toward children. He admitted that he was concerned, but said that he was not agitated and denied using profanity. Brenda Willis, Petitioner's cousin, corroborated his testimony as to what Officer Sample allegedly said to Tavarus. She testified that Petitioner told the officers that they should not talk to children like that, but that she then left the scene.

Respondent argues that, under these facts, Petitioner's conviction was "not based solely on his words, but on his actions," namely, his refusal to leave the area despite being ordered to do so. (Resp.'s Supp. Mem., at 8.) This is the only physical conduct that Respondent identifies as a basis for Petitioner's conviction and the only such action mentioned in the citation he received upon his arrest.[23] (See Rec. on Appeal, at 4 (copy of citation).) When the evidence is viewed in the light most favorable to the prosecution, there can be no doubt that Petitioner willfully disobeyed numerous orders to leave the area given by several police officers.

---

23. The only other possible physical contact between Petitioner and the police prior to his arrest was when he allegedly walked into Lieutenant Spear's outstretched arm. However, the testimony on this point was unclear as to whether he actually touched Spear's arm or whether, after seeing it, he stopped his approach. In any event, Respondent does not suggest that this sequence of events supported Petitioner's conviction.

"[R]efusing to move on after being directed to do so [by a police officer is] not, without more, protected by the First Amendment." *Colten v. Kentucky*, 407 U.S. 104, 109, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). In *Colten,* the Court rejected a First Amendment challenge to a statute that punished the refusal to comply with an officer's order to disperse because the law had been interpreted by the state courts to "infringe[ ] no protected speech or conduct." [24] *Id.* at 111, 92 S.Ct. at 1957. The Court distinguished *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), where it struck down a statute that, in addition to prohibiting the refusal to comply with a police officer's order to disperse, forbade "causing agitation or disquiet," which the Court held to be protected speech. *Colten,* 407 U.S. at 110–11, 92 S.Ct. at 1957–58. In contrast, the Kentucky statute was constitutional because it narrowly targeted the refusal to comply with a lawful police order and implicated no protected activity.

North Carolina has a similar, although not completely analogous, statute, which provides in relevant part as follows:

(a) Any law-enforcement officer or public official responsible for keeping the peace may issue a command to disperse in accordance with this section if he reasonably believes that a riot, or disorderly conduct by an assemblage of three or more persons, is occurring. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage.

(b) Any person who fails to comply with a lawful command to disperse is guilty of a Class 2 misdemeanor.

N.C. Gen.Stat. § 14–288.5 (1993). Much like the statute in *Colten,* this statute is narrowly tailored to prohibit the unprotected activity of refusing to obey a valid police command under certain circumstances. Had Petitioner been convicted under this statute, it is likely (although the court does not expressly de-

cide) that his conviction would withstand constitutional attack because his speech could not have been a basis for his conviction. However, as discussed above, N.C. Gen.Stat. § 14–223 "is not narrowly tailored to prohibit only disorderly conduct or fighting words." *Hill,* 482 U.S. at 465, 107 S.Ct. at 2511. Moreover, it "in no way resembles the law upheld in *Colten.*" *Id.* (footnote omitted). Because this statute has been broadly interpreted to cover certain forms of protected speech, it is impossible to determine whether Petitioner's conviction was based upon his actions—refusing to leave when so ordered—or his speech. Under § 14–223, either is possible.

In *Street v. New York,* 394 U.S. 576, 578, 89 S.Ct. 1354, 1358–59, 22 L.Ed.2d 572 (1969), the Supreme Court reviewed a conviction under a statute prohibiting the defilation of the American flag "either by words or act." The Court noted that, under *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the "appellant's conviction must be set aside if ... it could have been based solely upon his words and [if] a conviction on that basis would be unconstitutional." *Street,* 394 U.S. at 586–87, 89 S.Ct. at 1363. It then expanded this rule by stating that

when a single-count indictment or information charges the commission of a crime by virtue of the defendant's having done both a constitutionally protected act and one which may be unprotected, and a guilty verdict ensues without elucidation, there is an unacceptable danger that the trier of fact will have regarded the two acts as "intertwined" and have rested the conviction on both together.

*Id.* at 588, 89 S.Ct. at 1363–64 (citing *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Finding the appellant's speech constitutionally protected, and without deciding whether the First Amendment protects flag burning, the Court reversed his

---

24. The relevant portion of the statute read as follows:

"(1) A person is guilty of disorderly conduct if, with intent to cause a public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

[ ... ]

(f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to leave...."

*Id.* at 108, 92 S.Ct. at 1956 (quoting Ky.Rev.Stat. § 437.016(1)(f) (Supp.1968)).

conviction because it could have been based on his speech alone. *Id.* at 594, 89 S.Ct. at 1366–67.

The same analysis applies in this case. The citation used to charge Petitioner stated that he "Refused to leave the Area & kept Shouting & Arguing at [the] Officers." While his refusal to leave when so commanded would support a conviction under a statute narrowly written to target such conduct, his speech was also cited in support of the charge that he delayed and obstructed police officers, and the statute he was alleged to have violated allows convictions based on speech alone. Because the jury's verdict gives no insight as to the basis for Petitioner's conviction, it may stand only if the speech he used toward the officers was also unprotected. The court thus must analyze whether, considering the evidence at trial in the light most favorable to the prosecution, the speech Petitioner allegedly used is constitutionally proscribable.

 Despite the breadth of the First Amendment, "the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). "[T]here are categories of communications and certain special utterances to which the majestic protection of the First Amendment does not extend because they 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 504, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984) (quoting *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769). These include "libelous speech . . . fighting words, . . . incitement to riot, . . . obscenity . . . and child pornography." *Id.* (citations omitted). The principal question here is

whether Petitioner's words can be categorized as "fighting words." [25]

As discussed more fully above, *Hill* allows the punishment of words spoken to a police officer only if they "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. Even if, as the officers alleged, Petitioner used profanity such as "get the hell away from me," "don't put your damn hands on me," and "I'm not going any fucking where," his comments do not tend to incite a violent response in the intended recipient because they were not personal insults directed at any particular officer. *See Hess v. Indiana,* 414 U.S. 105, 107–08, 94 S.Ct. 326, 328–29, 38 L.Ed.2d 303 (1973) (per curiam) (holding that statement, "We'll take the fucking street later [or again]," was not fighting words because it was neither a personal insult nor directed to anyone in particular). While Petitioner certainly expressed his disapproval of Officer Sample's use of profanity and the officers' subsequent attempts to pacify him, his comments were not "personally abusive epithets" that "are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). He therefore did not use fighting words susceptible of punishment under the First Amendment.

The undersigned also believes that the Superior Court's implicit ruling that Petitioner's complaints to the police officers were "fighting words" was an unreasonable application of *Hill* and *Chaplinsky.* The court recognizes that its review of the state court's ultimate conclusion is more deferential than *de novo* review. However,

> Congress would not have used the word 'unreasonable' if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S.

**25.** The libel, obscenity, and child pornography exceptions do not apply in this case. Moreover, Petitioner's speech could not have been punished as incitement to riot unless his "advocacy [wa]s directed to inciting or producing imminent lawless action and [wa]s likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430

(1969) (per curiam). Although there was testimony that the crowd seemed to become more unruly when Petitioner spoke, the evidence does not support the conclusion that he was advocating "imminent lawless action" or that his complaints regarding officer Sample's choice of language were "likely to produce such action." *Id.*

Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue.

*Hall v. Washington,* 106 F.3d 742, 749 (7th Cir.1997). This is such a case, as any conclusion that Petitioner used "fighting words" is unsupported by the record and at complete odds with *Hill* and *Chaplinsky.*

 Without a doubt, the police officers were faced with a difficult situation that called for the exercise of authority in order to keep the crowd under control and prevent any further violence. While their chief objective was to force Petitioner's compliance with their repeated orders that he leave the scene, the offense with which they charged him impermissibly allows the punishment of constitutionally protected speech. As the Supreme Court stated while most recently addressing this area of jurisprudence, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill,* 482 U.S. at 462–63, 107 S.Ct. at 2510. Because Petitioner's comments did not fall within the narrowly defined class of "fighting words" so devoid of value as to be unprotected under the First Amendment, the possibility exists that he was convicted for his speech, and not for his actions. Under *Street,* the danger that the jury based its verdict on protected activity requires that his conviction be vacated as a matter of law.[26]

26. Under the Rule 8 of Rules Governing Section 2254 Cases in the United States District Courts, the court must, after the state has answered the petition, "determine whether an evidentiary hearing is required." Even after the amendments found in the AEDPA, the standard for whether such a hearing is required "is this: Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of trial or in a collateral proceeding." *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

Here, the facts regarding what Petitioner said are still in dispute. However, an evidentiary hearing is not necessary for two reasons. First,

### III. *Conclusion*

Accordingly, the undersigned RECOMMENDS that Respondent's Motion for Summary Judgment be DENIED, that the petition for writ of habeas corpus be GRANTED, and that Petitioner's conviction be VACATED as violative of the First and Fourteenth Amendments.

his statements are not fighting words even if the evidence is viewed in the light most favorable to the prosecution, that is, even if officer Byrum and Lieutenant Spear's assertions that Petitioner freely used profanity are true. More importantly, the question under *Street* is not what the facts are determined to be at some later date, but whether, in light of the testimony actually presented at trial, the defendant's conviction could be even partially based on constitutionally protected behavior. For this reason, a hearing in this court is unnecessary, and the petition may be disposed of as a matter of law based on the state court record. *See* Rule 8, advisory committee notes ("If no hearing is required, most petitions are dismissed, but in unusual cases the court may grant the relief sought without a hearing."). This is, without doubt, an unusual habeas corpus case.