### UNITED STATES of America,

### v.

### Michael McDERMOTT.

### Criminal No. 97–505–M.

United States District Court,
E.D. Pennsylvania.

July 30, 1997.

Mark Ehlers, Asst. U.S. Atty., U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Mark Wilson, Federal Defender's Ass'n, Philadelphia, PA, for Defendant.

### *MEMORANDUM*

DALZELL, District Judge.

This criminal appeal raises the question whether someone who utters vulgarities at security officers while being questioned can be guilty of disorderly conduct.

### I. *Background*

At about 3:30 a.m. on April 4, 1997, Petty Officer Robert Derouin, who was on duty as a security officer at the Willow Grove Naval Air Station, rousted appellant Michael McDermott from his slumber in the backseat of his car, which was parked in the lot of the Pitcairn Club, an enlisted personnel club at the Air Station.[1] Earlier that evening,

---

1. *See* June 12, 1997 Trial Transcript at 15 ("Q: When you saw my client curled up in the back-

McDermott—who is a First Class Petty Officer and has served in the Navy for the past eleven years and in the Marine Corps for eleven years before that—had, after consuming about eight beers at the Pitcairn Club, wisely elected to sleep in his car (with his dog standing guard in the front seat) rather than drive home.[2]

At the trial before Magistrate Judge Arnold C. Rapoport,[3] Petty Officer Derouin described McDermott's conduct after McDermott stepped out of the car:

> [W]e started to ask him some questions and immediately he became verbally abusive, using profanity toward us. Petty Officer Bates [who was backing Derouin up] kept on trying to ask him some questions. Profanity continued. Petty Officer Bates warned Mr. McDermott that if he did not cease with the profanity that he would call on Horsham Township Police Department and have Mr. [McDermott] arrested for drunk and disorderly.
>
> That did not help any. Mr. McDermott continued to still use the profanity towards the officers. [After handcuffing McDermott, he] still used profanity towards us, did not want to be cooperative whatsoever.

Tr. at 10–11. McDermott's use of "profanity",[4] Petty Officer Derouin testified, "lasted about three minutes." Tr. at 13.

McDermott does not contest that when he was awakened he said to the officers, "This is bullshit." Tr. at 34.[5] In McDermott's estimation, his speech was not out of bounds: "I never swore at them. I was saying just normal sailor, Navy talk, like this is bullshit and I can't believe you guys are doing this."

Tr. at 37. For the benefit of the trial court, McDermott explained the *argot* peculiar to the ranks of our Armed Forces: "It's normal, when guys are all standing around, and we fly airplanes, I fly airplanes, and we talk like that all the time. And I was talking to somebody I had worked with for five years who worked under me and has been on hundreds of flight hours with me and I'm like, fine, what the fuck is going on? Why, you know, what's going on?" Tr. at 37.

There is no allegation that McDermott attempted to strike the officers when they handcuffed him, see Tr. at 17, or—aside from his use of salty sailor talk—was in any other way uncooperative, see Tr. at 18. Nonetheless, McDermott was cited that evening for disorderly conduct, see 18 Pa. Cons.Stat. § 5503, and public drunkenness, see 18 Pa. Cons.Stat. § 5005, both summary offenses in the Commonwealth.

After a trial on June 12, 1997, McDermott was found guilty of disorderly conduct, fined fifty dollars and assessed five dollars in costs. *See* Tr. at 40. McDermott appealed his conviction four days later under Fed.R.Crim.P. 58(g)(2)(B) & (D) and 18 U.S.C. § 3402.

After a hearing today, we find as a matter of law that McDermott was not guilty of the crime he was convicted of.

## II. *Legal Analysis*

The Commonwealth's disorderly conduct statute is contained in § 5503 of its Criminal Code, the relevant portion of which provides:

> A person is guilty of disorderly conduct if, with intent to cause public inconve-

---

seat, he appeared to be asleep to you; is that right? A: Yes, sir. He had a Government wool blanket pulled up over his head.") (hereinafter "Tr. __.").

**2.** *See* Tr. at 29 ("Q: About how much had you had to drink at the Pitcairn Club? A: I'd say about six, six beers, six, maybe eight."); *id.* ("Well, I'm a pretty big guy and I wasn't—I didn't feel like I was drunk, but I didn't feel like taking any risks.")

**3.** The state summary offenses with which McDermott was ultimately charged, *see infra,* have been adopted for areas within federal jurisdiction such as the Naval Air Station. *See* 18 U.S.C. § 13(a). Federal District Courts have jurisdiction to hear

such cases pursuant to 18 U.S.C. § 3231, and United States Magistrate Judges have jurisdiction to hear misdemeanor cases, such as this one, under 18 U.S.C. § 3401.

**4.** McDermott did not, in fact, say anything *profane, i.e.,* "[c]haracterized by disregard for or contempt of sacred things, esp., in later use, by the taking of God's name in vain", XII *The Oxford English Dictionary* 570 (2d ed.1989).

**5.** The Government's position is that McDermott added, "I'm not fucking going anywhere" after saying, "This is bullshit." Tr. at 34. In any event, the gravamen of McDermott's speech was about the same.

nience, annoyance or alarm, or recklessly creating a risk thereof, he . . .

(3) uses obscene language, or makes an obscene gesture. . . .

18 Pa. Cons. Stat. § 5503(a)(3).[6]

The Pennsylvania General Assembly has adopted, and the courts in the Commonwealth have applied, the test set forth in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), in defining what is "obscene" under the state statute. *See* 18 Pa. Cons.Stat. 5903(b); *Commonwealth v. Bryner*, 438 Pa.Super. 473, 652 A.2d 909, 910–11 (1995). The Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), established what has become a well-entrenched definition of "obscenity" in First Amendment jurisprudence:

(a) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2615 (internal citations and quotation marks omitted).[7]

The Pennsylvania courts have also considered "fighting words", as defined in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), to fall within the purview of the statute.[8] *See Commonwealth v. Pringle*, 304 Pa.Super. 67, 450 A.2d 103, 107 (1982).

With these definitions in mind, both federal and state courts in Pennsylvania have grappled with the question of whether certain vulgarisms in particular contexts are "obscene" under § 5503(a)(3). In *Commonwealth v. Pringle, supra*, for example, the Pennsylvania Superior Court upheld the appellant's conviction under subsection (a)(3) of the disorderly conduct statute for referring to police officers as "goddamn fucking pigs" as they attempted to arrest another individual before a large crowd. The Superior Court reasoned that "one may be convicted of disorderly conduct for engaging in the activity of shouting profane names and insults at police officers on a public street while the officers attempt to carry out their lawful duties." *Id.* 450 A.2d at 106.[9] The Superior

**6.** The statute criminalizes other behavior as well, *e.g.*, engaging in fighting, threatening, violent or tumultuous behavior, *see* § 5503(a)(1), or making unreasonable noise, *see id.* (a)(2), or creating a hazardous or physically offensive condition, *see id.* (a)(4). Although the record is not explicit, it is clear from the Government's legal arguments at trial that it only considered McDermott guilty of using "obscene language" under subparagraph (a)(3) of the statute. *See* Tr. at 25 & 39.

**7.** The application of the *Miller* standard to Pennsylvania's disorderly conduct statute is not, however, without its difficulties. *See Brockway v. Shepherd*, 942 F.Supp. 1012, 1016 (M.D.Pa.1996) ("It seems to this court that there is an inherent conflict in applying the *Miller* standard to an act intended to cause public inconvenience, annoyance or alarm. That is, the manner in which § 5503(a) is drafted seems to cause a sort of overlap of the concepts of obscenity or decency and disorderly conduct.").

**8.** Chaplinsky instructs that:

Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940).

**9.** In *Pringle v. Court of Common Pleas*, 778 F.2d 998 (3d Cir.1985), our Court of Appeals granted the same Pringle a writ of habeas corpus, holding on due process grounds, in a *per curium* opinion, that Pringle could not have known, at the time he directed his words at the police officers, that his language in those circumstances was "obscene" under the statute:

Court held that the use of the word "fuck" under these circumstances was obscene and constituted "fighting words." *Id.* at 107.

The Superior Court, on the other hand, recently held that "Go to hell, Betsy", when shouted in a public space, was not "obscene" under the statute because the epithet "did not, in any way, appeal to anyone's prurient interest." *See Commonwealth v. Bryner,* 438 Pa.Super. 473, 652 A.2d 909, 912 (1995); *see also id.* 652 A.2d at 912 n. 4 (not reaching the issue of whether the words constituted fighting words). In *Brockway v. Shepherd,* 942 F.Supp. 1012 (M.D.Pa.1996), the court found that a passenger in a car who extended "his middle finger" at a police officer did not engage in obscene conduct under the Commonwealth's disorderly conduct statute. *See id.* at 1016–17. In an attempt to clarify this area of the law, Judge McClure emphasized that:

> The use of profane or vulgar language is protected by the First Amendment unless some exception to the general protection applies. That is, standing alone, profane or vulgar language is not itself obscene and does not amount to fighting words. The same principle applies to the use of a gesture which represents profane or vulgar language, and the communication must be looked at in its entirety and in context to determine whether an exception to the general protection of speech applies. More specifically, § 5503(a)(3) does *not* proscribe the display of a person's middle finger with the ordinary intent (i.e. to show disrespect) because such conduct is not sexual in nature.

*Id.* at 1017.

 The type of language McDermott admits he used in the wee hours of April 4, 1997, or which Petty Officer Derouin claims McDermott used, was not "obscene" under the statute because it was not sexual or "prurient" in nature.[10] Rather, McDermott, who may still have been somewhat drunk at the time, intended to express his extreme displeasure to the Petty Officers at being awakened. At most, McDermott intended to show his disrespect for the Petty Officers and to offend them. Emphatic and vulgar expressions of one's discontent with an official's actions, while distasteful to the ear and offensive to the ego, are not—standing alone—"obscene" under the First Amendment and therefore without constitutional protection.

Furthermore, McDermott's use of coarse language here does not constitute fighting words. In Justice Holmes's words, "the character of every act depends upon the circumstances in which it is done." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). There is no evidence that McDermott sought to incite others to prevent his arrest. The only people present in the parking lot of the Pitcairn Club that morning were McDermott, the two Petty Officers, two other individuals—and McDermott's dog. *Cf. Pringle,* 450 A.2d at 107 (defendant who "looked directly at" arresting officer and "repeatedly shouted 'goddamn fucking pigs'" before a large crowd engaged in "fighting words" and "created a risk of public inconvenience, annoyance [and] alarm" in violation of the disorderly conduct statute); *Commonwealth v. Crawford,* 334 Pa.Super. 630, 483 A.2d 916 (1984) (same). Nor is there any evidence that McDermott intended by his words to start a fight with

---

We hold merely that the [disorderly conduct statute,] as applied to Pringle's particular speech in 1979, did not meet constitutional requirements of adequate notice.

The Commonwealth, speaking through its Superior Court, has now declared that the words uttered by Pringle, when directed at police officers, fall within the proscription of the statute. Therefore, the due process argument which prevails today will no longer be available to similarly situated defendants whose actions occurred after the 1982 Superior Court decision.

We offer no opinion on the other constitutional assertions raised by Pringle, as this Court will not resolve constitutional questions unnecessarily.
*Id.* at 1004.

**10.** Because § 5503 is a criminal statute, we must construe it strictly. As Chief Justice John Marshall long ago observed in *United States v. Wiltberger,* 18 U.S.(5 Wheat.) 76, 95, 5 L.Ed. 37 (1820):

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals....

the Petty Officers. Indeed, Petty Officer Derouin testified that McDermott did not physically resist arrest or engage in any physical struggle with him. *See Masses Publ'g Co. v. Patten,* 244 F. 535, 540 (1917) (L. Hand, J.). Finally, the words McDermott uttered—whether they were variants of *fuck* or *bullshit*—are insufficient by themselves to constitute constitutionally unprotected fighting words. *See, e.g., Hess v. Indiana,* 414 U.S. 105, 107, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (holding that yelling, "We'll take the fucking street later", could not be punished as fighting words); *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 1785–86, 29 L.Ed.2d 284 (1971) (the words "Fuck the Draft" on defendant's jacket did not constitute fighting words).

While there is no question that McDermott's speech early that morning was rude, discourteous, ill-mannered, coarse and boorish, it is not without constitutional protection.[11] It is one thing to be called vulgar for one's words, but it is quite another to be held a criminal for them.

An appropriate Order follows.

### ORDER

AND NOW, this 30th day of July, 1997, after a hearing today on appellant Michael McDermott's appeal from his judgment of conviction, it is hereby ORDERED that:

1. The June 12, 1997 Judgment of Conviction, entered on June 20, 1997, is REVERSED; and

2. The criminal charges are DISMISSED WITH PREJUDICE.

---

**11.** While McDermott's expressions are not "obscene" in the constitutional sense, they certainly were *obscene* in everyday parlance, especially in light of the fact that the Petty Officers acted professionally and patiently with an individual whose speech was offensive, uncivil and little short of rising to the level of contempt. *See* X *The Oxford English Dictionary* 656 (2d ed.1989) (defining *obscene* as "Offensive to the senses, or to taste or refinement; disgusting, repulsive, filthy, foul, abominable, loathsome.").