759 So.2d 1274 (2000)
William BRENDLE a/k/a William D. Brendle, Appellant,
v.
CITY OF HOUSTON, Mississippi, Appellee.
No. 1998-KM-01656-COA.
Court of Appeals of Mississippi.
June 6, 2000.
*1275 Luther C. Fisher, IV, Tupelo, Attorney for Appellant.
James M. Hood, Jr., Houston, Attorney for Appellee.
EN BANC.
LEE, J., for the Court:
¶ 1. This is a case originating in the Municipal Court of Houston, Mississippi in which the appellant, William Brendle, was convicted of public profanity and resisting arrest. Brendle appealed and after a trial *1276 de novo, the Circuit Court of the First Judicial District of Chickasaw County "affirmed" the judgment of the municipal court and remanded the case to the municipal court for sentencing. Brendle timely perfected his appeal to this Court raising the following issues: (1) whether the trial court erred in denying Brendle's motion to dismiss the charges of public profanity and resisting arrest based on lack of jurisdiction; (2) whether Brendle's speech constituted public profanity as a matter of law; (3) whether Brendle used reasonable means to resist arrest; (4) whether the circuit court erred in excluding a prior tape recorded statement; and (5) whether the circuit court erred in excluding the Houston Police Department's Code of Ethics/Rules of Conduct. After determining that the circuit court committed manifest error in applying the law to the facts of this case, we reverse and vacate Brendle's conviction.

FACTS
¶ 2. On January 19, 1996, Herbert Miller sought the assistance of Houston Police Officer Trances Ford. Miller had a business dispute with Chickasaw Mechanic, Inc. owner William Brendle and believed that discussions with Brendle might lead to an altercation or disturbance. Officer Ford informed Miller that he would only accompany Miller as an observer. Ford, however, allowed Miller to travel to Brendle's mechanic shop with him in his police vehicle. Once at Chickasaw Mechanic, both Miller and Officer Ford entered the Chickasaw Mechanic, Inc. office. Miller spoke to William Brendle's wife. Shortly thereafter, Brendle entered the office and the two men discussed Miller's problem. According to Officer Ford, it was during this discussion that Brendle used profanity. Officer Ford testified that, to the best of his recollection, Brendle said (to him), "I'm tired of this God d___ police sticking their nose in s___ that doesn't even involve them." Officer Ford testified that after Brendle initially used the profane language he issued a warning to him not to do so again or he would arrest Brendle. Despite Officer Ford's admonition, Brendle voiced additional profane remarks towards Officer Ford.
¶ 3. Brendle's recollection of the discussion differed. He testified that he questioned Officer Ford about the City of Houston's ethics policies regarding police officers transporting civilians. Brendle claims the profanities he expressed were in response to the profane language used by Officer Ford in response to the question.
¶ 4. Officer Ford then informed Brendle that he was under arrest. According to Ford, Brendle did not cooperate and "snatched himself away" from Ford's grip. Ford testified that he wrestled with Brendle to the ground before handcuffing him. Consequently, Officer Ford charged Brendle with public profanity and resisting arrest. The charges against Brendle were initially written on standard Uniform Traffic Violation tickets. Ticket no. 005439 charged Brendle with "public profanity" and ticket no. 005438 charged him with "resisting arrest." The tickets were signed by Officer Ford and dated January 18, 1996.
¶ 5. While there is no transcript of the proceedings before the municipal court, there are indications in the circuit court record that at the municipal court level, defense counsel challenged the sufficiency of the traffic tickets to apprise him of the charges against him. At the municipal court trial held sometime in November of 1996, the City's attorney made an ore tenus motion to amend the charges. Then on January 24, 1997, the City filed two affidavits in which Officer Ford attested that Brendle said the words "God d___", "d___," and "f___" in a public place-Chickasaw Mechanic, Inc.-and in the presence of two or more persons. In addition, Ford swore that Brendle resisted his arrest.
¶ 6. On the same day the affidavits were filed, the municipal court judge entered a judgment of guilty as to both charges and fined Brendle $120 for the public profanity charge and $330 for the charge of resisting arrest. On January 27, 1997, Brendle filed *1277 his notice of appeal to the Circuit Court of the First Judicial District of Chickasaw County, Mississippi.
¶ 7. The circuit court trial was held on September 21, 1998. Counsel for Brendle again moved to dismiss the matter for lack of jurisdiction on the grounds that the uniform traffic tickets failed to set out the elements of the crimes for which he was charged and failed to name the statutes which he allegedly violated. The circuit court denied Brendle's motion "without prejudice."
¶ 8. Brendle and his wife testified for the defense. Essentially, Brendle testified that any profanities he made were in response to such words being used against him. Mrs. Brendle testified that after her husband questioned him, Officer Ford said, "Well, I'm going to get some answers to my d___ questions." Even further she stated that as her husband turned his back on Officer Ford to return to his office, Officer Ford took Brendle by the shoulders, from behind, and "slung" him to the ground before handcuffing him.
¶ 9. At the close of trial, the circuit court announced that it would make its ruling the following day. On October 2, 1998, the circuit court entered its final judgment "affirming" the municipal court's guilty verdicts and remanding the matter to the municipal court for sentencing.[1] Brendle then initiated this appeal.

DISCUSSION
¶ 10. Brendle raised a number of issues on appeal. However, we will discuss only one issue as we have determined it to be dispositive of this case. We first recognize our standard of appellate review. Generally, we will not reverse a trial judge sitting without a jury, unless the findings of the trial judge are manifestly erroneous or clearly wrong. Amerson v. State, 648 So.2d 58, 60 (Miss.1994).
WHETHER THE LANGUAGE USED BY BRENDLE WAS PROTECTED SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
¶ 11. Brendle argues that Mississippi Code Annotated section 97-29-47 (Rev. 1994) was unconstitutionally applied to his case.[2] Section 97-29-47 provides:
Public profanity or drunkenness
If any person shall profanely swear or curse, or use vulgar and indecent language, or be drunk in any public place, in the presence of two (2) or more persons, he shall, on conviction thereof, be fined not more than one hundred dollars ($100.00) or be imprisoned in the county jail not more than thirty (30) days or both.
¶ 12. Brendle asserts that he was "charged for public speech about a public and political matter related to the violation of law by [a] law enforcement officer." More specifically, Brendle contends that even if it is assumed that he actually spoke the words as attested to by Officer Ford, that such speech was "pure speech" protected by the First Amendment to the U.S. Constitution. He relies on Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), to advocate that the language he used does not constitute profanity because there was no showing of any intent to incite disobedience, cause a fight, or otherwise cause a violation of law. In Cohen, the defendant was convicted under a California breach of the peace statute prohibiting a disturbance of the peace by offensive conduct for walking through a *1278 courthouse corridor wearing a jacket bearing the words "F___ the Draft" in a place where women and children were present. Id. at 16, 91 S.Ct. 1780. The United States Supreme Court held that the conviction could not be justified either upon a theory that the quoted words were inherently likely to cause violent reaction or upon the assertion that the states may properly remove such an offensive word from the public vocabulary. Id. at 25, 91 S.Ct. 1780. The Supreme Court determined that the states may not, consistently with the First and Fourteenth Amendments, make the "simple public display involved of the single four-letter expletive a criminal offense." Id. at 26, 91 S.Ct. 1780.
¶ 13. Brendle closes his argument with the assertion that even in cases involving "the most `scurrilous' epithets, the State cannot regulate the civility of such speech when it is about a matter of public concern, constitute[s] pure speech and is not intended to cause any violation of laws." The City's response to Brendle's assertions is that Cohen, on its facts, is distinguishable from Brendle's case. Further, the City contends that "Brendle's cursing of the police was directed at a police officer and would have been taken as a personal insult by any person of reasonable sensibilities."
¶ 14. It is important to observe here that Brendle does not challenge the constitutionality of Mississippi's public profanity statute on its face nor does he challenge the sufficiency of the evidence to support the charges for public profanity.[3] Neither was appropriately preserved for our review. Rather, Brendle claims that the public profanity statute was unconstitutionally applied to him. In other words, he asserts that the words he used in his exchange with Officer Ford encompassed constitutionally protected speech not subject to regulation by the State of Mississippi. The ultimate question is whether Brendle's words can constitutionally support a conviction or whether they are protected by the First Amendment.
¶ 15. The Mississippi Supreme Court has not been given the opportunity to interpret section 97-29-47 of the Mississippi Code, as amended. Accordingly, this presents us with a matter of first impression. "In a case of first impression Mississippi Courts look to other jurisdictions in determining the matter." Sheppard v. Mississippi State Highway Patrol, 693 So.2d 1326, 1329 (Miss.1997) (quoting Glover v. Daniels, 310 F.Supp. 750, 753 (N.D.Miss.1970)). While there are several cases dealing with applications of this statute to particular situations, most (pertaining to that portion of the statute involving public profanity) address what language constitutes profanity or whether the place was a "public place" for purposes of the statute. None of the cases address the issue of constitutional application of the statute. Therefore, here we will examine the U.S. Supreme Court decisions and those of other jurisdictions involving constitutionally protected and unprotected speech with emphasis on language addressed to law enforcement officers.
¶ 16. The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law ... abridging the freedom of *1279 speech...." U.S. CONST.Amend. I. The Fourteenth Amendment prohibits the states from "abridg[ing] the privileges and immunities" granted to us by way of the U.S. Constitution. U.S. CONST. amend XIV. However, the freedom of speech is not absolute. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). In the landmark case of Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the United States Supreme Court articulated that there are definite and narrowly limited classes of speech which "the prevention and punishment of ... [have] never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and insulting or `fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky, 315 U.S. at 571, 62 S.Ct. 766. Chaplinsky was convicted for addressing to another on a public sidewalk the words, "You are a God d___ed racketeer," and "a d___ ed Fascist and the whole government of Rochester are Fascists or agents of Fascists." Id. at 569, 62 S.Ct. 766. The New Hampshire law under which Chaplinsky was convicted provided: "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name...." Id. On appeal, Chaplinsky challenged the constitutionality of the statute as inhibiting freedom of expression because it was vague and indefinite. Id. However, because the New Hampshire Supreme Court had previously construed the statute as being limited to those words having "a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed ...," the Supreme Court upheld the statute as having been "narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace." Id. at 573, 62 S.Ct. 766 (citations omitted). Still, the Chaplinsky court observed that those words constituting fighting words were "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Id. at 574, 62 S.Ct. 766.
¶ 17. Since Chaplinsky, the Supreme Court has narrowed and clarified the extent of the "fighting words doctrine." First, the high court confined the definition of "fighting words" to those which incite a breach of peace. Gooding v. Wilson, 405 U.S. 518, 524, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). See also Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). In Gooding, the appellee was convicted of using "opprobrious words and abusive language" in violation of a Georgia statute which provided: "Any person who shall, without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace ... shall be guilty of a misdemeanor." Gooding, 405 U.S. at 519, 92 S.Ct. 1103. Gooding challenged the conviction charging that the statute was vague and overbroad in violation of the First and Fourteenth Amendments. Id. Finding that the statute did not meet the requirements of the "fighting words doctrine," the Supreme Court ruled that it was overbroad because it was not limited to words which tended to cause a breach of the peace. Id. at 527, 92 S.Ct. 1103. The Supreme Court further expounded on the limitations of the "fighting words doctrine" in the more recent case mentioned above, Cohen v. California. There, the Supreme Court added that in the regulation of "fighting words", such words must also be "directed to the person of the hearer." Cohen, 403 U.S. at 20, 91 S.Ct. 1780 (quoting Cantwell v. State of Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).
¶ 18. A number of jurisdictions have addressed the constitutionality of certain speech directed at law enforcement officers *1280 and in a couple of instances, the U.S. Supreme Court has addressed the issue as well. In City of Houston v. Hill, 482 U.S. 451, 454, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), a Houston, Texas city ordinance prohibiting the interruption of a police officer in the performance of his duties was held unconstitutionally overbroad on the basis that the law attempted to regulate speech that was also constitutionally protected. In so holding, the Supreme Court commented that the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." Id. at 461, 107 S.Ct. 2502. Quoting the majority opinion in Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), the Court in Hill, stated: "Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Hill, 482 U.S. at 461, 107 S.Ct. 2502. Even further, the high court declared that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id. at 462-63, 107 S.Ct. 2502.
¶ 19. In the U.S. Supreme Court case of Hess v. Indiana, 414 U.S. 105, 107, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), the Supreme Court ruled that yelling, "We'll take the Fing street later," to a crowd at an antiwar demonstration as law enforcement officers were attempting to clear the street, could not be punished as obscene or as "fighting words." Testimony indicated that Hess was not exhorting the crowd to return to the street, that he was facing the crowd and not the street when he uttered the statement, that his statement was not addressed to any particular individual or group, and that his tone, although loud, was not louder than any of the others in the area. Id. at 106, 94 S.Ct. 326. The Court determined that Indiana's disorderly conduct statute was applied to Hess to punish only spoken words. Id. Citing Gooding, the Supreme Court concluded that the words did not fall within any of the "limited classes" of speech allowed to be regulated by the states. Id.
¶ 20. Another U.S. Supreme Court case involved obscenities and threats shouted to an officer who had asked the appellant's husband to produce his driver's license. See Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). In Lewis, the appellant was convicted under a municipal ordinance prohibiting persons from wantonly cursing, reviling or using obscene or opprobrious language "toward or with reference to any member of the city police while in the actual performance of his duty." Lewis, 415 U.S. at 132, 94 S.Ct. 970. In vacating the conviction and invalidating the ordinance as facially overbroad, the Supreme Court indicated that it arrived at its decision because the ordinance "punishe[d] only spoken words" and was not limited in scope to fighting words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id. at 133, 94 S.Ct. 970 (quoting Gooding, 405 U.S. at 525, 92 S.Ct. 1103). Furthermore, in his concurring opinion, Justice Powell suggested that even the "fighting words" exception recognized in Chaplinsky might impose a more limited application in cases involving speech to a police officer, as he stated "a properly trained officer may reasonably be expected to `exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to `fighting words.'" Lewis, 415 U.S. at 135, 94 S.Ct. 970 (concurring opinion) (citation omitted).
¶ 21. Other federal courts have handled cases in which profane language was addressed to police officers. In Brooks v. North Carolina Dept. of Correction, 984 F.Supp. 940, 960 (E.D.N.C.1997), the district court determined that "Hill allows the punishment of words spoken to a police officer only if they by their very utterance inflict injury or tend to incite an *1281 immediate breach of the peace." Id. (quoting Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766). In Brooks, police officers alleged that the defendant said: "get the hell away from me," "don't put your d___ hands on me," and "I'm not going any f___ ing where." Brooks, 984 F.Supp. at 960. The district court reasoned that Brooks's comments did "not tend to incite a violent response in the intended recipient because they were not personal insults directed at any particular officer." Id. While Brooks expressed his disagreement of the officers' use of profanity and the "officers' subsequent attempts to pacify him, his comments were not `personally abusive epithets' that `are, as a matter of common knowledge, inherently likely to provoke violent reaction.'" Id. (quoting Cohen, 403 U.S. at 20, 91 S.Ct. 1780). The district court observed that "[b]ecause Petitioner's comments did not fall within the narrowly defined class of `fighting words' so devoid of value as to be unprotected under the First Amendment, the possibility exists that he was convicted for his speech." Brooks, 984 F.Supp. at 961. Thus, the district court concluded that Brooks did not use fighting words susceptible of punishment under the First Amendment. Id.
¶ 22. Likewise, in United States v. McDermott, 971 F.Supp. 939, 942 (E.D.Pa. 1997), the United States District Court for the Eastern District of Pennsylvania stated: "Emphatic and vulgar expressions of one's discontent with an official's actions, while distasteful to the ear and offensive to the ego, are not-standing alone-`obscene' under the First Amendment and therefore without constitutional protection." (emphasis added). In McDermott, a sailor opted to sleep in his vehicle rather than drive intoxicated. McDermott, 971 F.Supp. at 939-40. When he was awakened by naval security officers, he said "This is bulls___." Id. at 940. The naval officers testified that the sailor verbally abused them by yelling profanities and he also stated: "I'm not f___ing going anywhere." Id. McDermott was arrested and found guilty of disorderly conduct under a state statute. Id. The district court decided that McDermott's language while rude, discourteous, ill-mannered, course and boorish, did not constitute fighting words. Id. at 943. In so ruling, the court pointed out that there was no evidence that McDermott sought to incite others to prevent his arrest. Id. at 942.
¶ 23. Several state courts have been confronted with this issue. Recently, in Commonwealth v. Hock, 556 Pa. 409, 728 A.2d 943 (1999), it was held that a defendant's remark "f___ you" to a police officer did not constitute fighting words. In Hock, the defendant uttered the single epithet in a normal tone of voice and while walking away from the officer. Hock, 728 A.2d at 944. The court noted that the statement did not alarm or frighten the officer, and there were no bystanders. Id. at 946. Nevertheless, the Commonwealth contended that the insult rose to a "level of disorderly conduct because of the police-initiated violence it could have generated." Id. The Commonwealth asserted that police officers must have a lawful recourse when insulted in such a manner. Id. The Pennsylvania Supreme Court, however, was not convinced that Hock's remark constituted fighting words. Id. at 946. Indeed, in determining whether words were "fighting words," the court stated: "[T]he circumstances surrounding the words can be crucial, for only against the background of surrounding events can a judgment be made whether [the] words had a direct tendency to cause acts of violence by [others]." Id. (quoting Lamar v. Banks, 684 F.2d 714 (11th Cir.1982)).
¶ 24. The court decided that under the facts of the case, the trier of fact could not reasonably find that Hock's epithet "risked an immediate breach of the peace." Hock, 728 A.2d at 947. In so holding, the court declined to embrace the Commonwealth's argument "that the police are likely to respond to verbal insults with unlawful violence." Id. The court disputed the Commonwealth's position concluding that "police officers have a legal duty to enforce the law is sufficient reason to presume that *1282 they will not violate the law." Id. (citing City of Chicago v. Blakemore, 15 Ill. App.3d 994, 305 N.E.2d 687, 689 (Ct.1973) ("[W]ords addressed to an officer in an insolent manner do not without any other overt act tend to breach the peace because it is the sworn duty and obligation of the officer not to breach the peace and beyond this to conduct himself so as to keep others from so doing")). Even further, the Pennsylvania court reasoned:
We recognize that the police often place their lives in jeopardy to ensure the safety of the citizenry and thus perform a task that is valuable, necessary and, at times, heroic. Accordingly, the prospect of a citizen verbally abusing a police officer appears particularly objectionable. It does not follow, however, that Section 5503(a) may be used as a vehicle to protect the police from all verbal indignities, especially under the dubious hypothesis that officers are likely to break the law when affronted. The police must expect that, as part of their jobs, they will be exposed to daily contact with distraught individuals in emotionally charged situations.
Hock, 728 A.2d at 947 (citations omitted). Accordingly, the Hock court held that the defendant's words did not constitute disorderly conduct, and the law enforcement officer lacked probable cause to arrest her for that crime.
¶ 25. One jurisdiction which has dealt with a city ordinance very similar to our profanity statute is the State of Michigan in City of Pontiac v. Klein, 67 Mich.App. 556, 242 N.W.2d 436 (1976). The City of Pontiac had a local ordinance prohibiting use of "indecent, profane, or obscene language in the presence of others." Id. (quoting Pontiac Ordinance No. 728, § 2A(20a)).[4] At trial, the defendants requested a jury instruction informing the jury they could only convict the defendants of the charges if they found that the words uttered by the defendants were "`fighting words' as that term is used in Chaplinsky v. New Hampshire... and in subsequent cases." Id. The Michigan Court of Appeals stated:
We are of the unanimous opinion that the trial judge instructed on the law as it should be but not as it is. It is ridiculous to perpetuate an artificial characterization of obscenity as constituting `fighting words'. We would ordinarily be disposed to take judicial notice that many members of society are not fighters. Does this illusive concept require motivation to combat from all who are exposed to the utterance? We think not but we are told by the highest court that `God d___ed mother F___ing police' must be determined by the trier of fact to be fighting words to sustain a conviction for violation of a breach of peace ordinance. Lewis v. New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).
While there are several types of speech which may properly be punished by the states, it appears that the `fighting words' classification is the only one which might properly have been applied to the defendants' conduct in the present case. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Since, as interpreted by the trial judge, the ordinance permitted the jury to convict the defendants after merely finding that their language was `grossly vulgar' or `profane', the convictions cannot be allowed to stand. Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).
We do not, however, strike down the ordinance itself. Rather, we hold that the interpretation employed by the trial judge was too broad. Therefore, the plaintiff city may, if it chooses, once again bring the defendants to trial under the ordinance. However, at any future trial, an instruction as requested by the defendants at their first trial must be given.
Id. at 437-38 (emphasis added). In City of Pontiac, it is very clear that the Michigan *1283 Court of Appeals did not agree with the United States Supreme Court's requirement that convictions for profane speech must rise to the level of "fighting words." Nonetheless, the Michigan appellate court reversed the conviction requiring the trial judge on retrial to instruct the jury, essentially, that to convict the defendants under the statute, they must first determine whether the words used constituted "fighting words."
¶ 26. As illustrated, the Supreme Court's decisions since Chaplinsky have consistently recognized that the states have the "power constitutionally to punish `fighting' words under carefully drawn statutes not also susceptible of application to protected expression." Gooding, 405 U.S. at 523, 92 S.Ct. 1103 (citations omitted). Accordingly, it is clear that Mississippi cannot, under the confines of the U.S. Constitution, regulate speech which does not fall into the categories of "fighting words," "obscene words," or some "libelous words." In this case we are not, obviously, dealing with libelous words. Additionally, we are not dealing with "obscene words." Obscene expressions are defined as those that appeal to prurient interests and are in some way erotic. Cohen, 403 U.S. at 20, 91 S.Ct. 1780. There is nothing to indicate that such is the case here. Thus, the question is whether Brendle's language constituted fighting words.
¶ 27. The Supreme Court of the United States observed "we have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words ... that annoy or offend them." Hill, 482 U.S. at 465, 107 S.Ct. 2502 (citations omitted). Thus, the fact that Ford may have sustained a personal insult from Brendle's epithets is not enough to make such speech unlawful.
¶ 28. "The character of every act depends upon the circumstances in which it is done." Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Defending Cohen's vulgarity ("F___ the Draft") in Cohen v. California, the Supreme Court ultimately refused to permit the State of California "to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us" when it stated that "one man's vulgarity is another's lyric." Cohen, 403 U.S. at 25, 91 S.Ct. 1780.
¶ 29. Mississippi case law holds that the word "d___" is "profane." InOrf v. State, 147 Miss. 160, 164, 113 So. 202, 202 (1927), the Mississippi Supreme Court held that the statement "Well, the `d___' thing is done broke up," voiced at the doors of a church while the Sunday school participants were being dismissed constituted profanity. In an even older case, the supreme court explained "that profanity consisted of any words importing an imprecation of Divine vengeance, or implying Divine condemnation, so used as to constitute a public nuisance." Id. (citing State v. Wiley, 76 Miss. 282, 24 So. 194 (1898)). However, the statement "Go to hell, you low-down devils" was held not be profane because it "lacked the imprecation of Divine vengeance, and did not imply Divine condemnation." Id. (citing Stafford[5]v. State, 91 Miss. 158, 44 So. 801 (1907)). In its analysis, the Orf court relied on Webster's Dictionary definition for the word "d___" which was stated as: "To invoke condemnation; to curse; to swear; to invoke condemnation upon; to condemn to eternal punishment in a future world; to consign to perdition." Orf, 147 Miss. at 164, 113 So. at 202.
¶ 30. As previously indicated, the Supreme Court of Mississippi has not had the opportunity to rule on the constitutionality of the statute under which Brendle was charged. Furthermore, it has been more than seventy years since the Mississippi Supreme Court has addressed whether certain language constitutes "profanity." A more modern definition of the word "d___" pursuant to the 1986 publication of Webster's Dictionary is: to adjudge guilty *1284 or culpable; to condemn to a punishment or fate; to doom to everlasting punishment in the future world; to bring about the damnation of; to condemn as invalid, illegal, immoral, bad, or harmful; to bring condemnation or ruin upon; to invoke damnation; to curse; to swear. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 572 (1986), While the definition of the word "d___" has not changed much over time, the frequency of its use in our society has. That is not to say that this Court condones its use. Suffice it to say that it is questionable that using the word "d___" today would be considered a "personal insult by any person of reasonable sensibilities" as the City advocates. It is not the definition of the words that has evolved over time, it is the "sensibilities" of our society that has changed.
¶ 31. The trial court did not make a finding that Brendle used "profane" language. However, what the trial court did do was essentially find Brendle guilty of violating the Mississippi legislature's proscription on the use of profane language in the presence of two or more persons and in a public place as delineated in section 97-29-47 of the Mississippi Code. Nonetheless, for our evaluation of this issue, it is important to establish what language used by Brendle is the subject of this appeal. The first record of what words Brendle voiced in his encounter with Officer Ford and Herbert Miller was Officer Ford's written affidavit that was filed with the municipal court on January 24, 1997 approximately a year after the incident occurred. In the sworn statement, Officer Ford attested that Brendle used the words/phrase "God d___," "d___" and "f___." However, when he testified eight months later before the Circuit Court of Chickasaw County, Ford could not recall whether Brendle had in fact used the "f" word.
¶ 32. Even assuming that Brendle used the "f" word in his speech, Brendle's language while vulgar, indecent, and arguably profane, did not rise to the level of "fighting words." His language was not "by its very utterance" sufficient to incite an immediate breach of the peace. This is not to say that shouting profanities at a police officer is appropriate or proper behavior in any circumstance. In fact, such conduct may give rise to a situation where an immediate breach of the peace may occur. However, the facts in this case do not support such a situation. Rather the testimony shows that some of the vulgarities used by Brendle were spoken as he turned away from Officer Ford attempting to return to his office. Even further, there was no evidence that Brendle's epithets sought to incite others to prevent his arrest. As such, we find that the circuit court committed manifest error in determining that Brendle's conduct gave rise to probable cause for his arrest for a violation of Mississippi's statute against public profanity. Accordingly, we vacate Brendle's conviction for public profanity.
¶ 33. Because we find that Brendle's arrest for public profanity was unlawful, the charges of resisting arrest are thereby undergirded. "The offense of resisting arrest presupposes a lawful arrest. A person has a right to use reasonable force to resist an unlawful arrest." Taylor v. State, 396 So.2d 39, 42 (Miss.1981) (quoting Pettis v. State, 209 Miss. 726, 48 So.2d 355 (1950)). Therefore, we also vacate the charges against Brendle for resisting arrest.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF CHICKASAW COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., SOUTHWICK, P.J., AND THOMAS, J., CONCUR. IRVING, J. CONCURS IN PART AND DISSENTS IN PART WITH A SEPARATE WRITTEN OPINION JOINED BY KING, J. MOORE, J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY BRIDGES AND PAYNE, JJ.
*1285 MOORE, J., DISSENTING:
¶ 35. I agree with the majority that: "Mississippi cannot, under the confines of the U.S. Constitution, regulate speech which does not fall into the categories of `fighting words,' `obscene words,' or some `libelous words.'" However, because I disagree with the majority's conclusion that the words spoken in the case sub judice "did not rise to the level of `fighting words,'" I respectfully dissent.
¶ 36. The United States Supreme Court in Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), defined "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id. Further:
[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."
Id. (citing Cantwell v. Connecticut, 310 U.S. 296, 309, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). "The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight." Id. at 573, 60 S.Ct. 900.
¶ 37. In Lewis v. City of New Orleans, 415 U.S. 130, 135, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), Justice Powell remarked in his concurring opinion that "a properly trained police officer may reasonably be expected to `exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to `fighting words.'" In City of Houston, Texas v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), the court stated that a significant amount of verbal criticism directed at a police officer is protected under the First Amendment. The court noted: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id. at 463.
¶ 38. The municipal ordinances which were challenged in both Lewis and Hill, prohibited certain language or actions directed toward police officers. The ordinances were not explicitly limited to fighting words and there was no evidence that the state courts involved in those respective cases narrowed construction of those ordinances to unprotected speech. The Hill court struck the Houston ordinance in question because it "criminalizes a substantial amount of constitutionally protected speech and accords the police unconstitutional discretion in enforcement." Id. at 466, 107 S.Ct. 2502. In the case sub judice, Miss.Code Ann. § 97-29-47 (Rev.1994) does not distinguish between language directed at the average person and that directed at police officers. The majority has acknowledged that we must restrict application of the statute to fighting words, obscene words, and certain libelous words. Unlike the law enforcement officers in Hill, Mississippi's police officers do not possess "unconstitutional discretion in enforcement" since application of the statute is restricted to the above, narrowly-defined areas of speech.
¶ 39. In other cases involving speech addressed to police officers, courts have accorded speech constitutional protection under certain circumstances. See Hess v. Indiana, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (the profanity uttered was in the context of an antiwar demonstration and the words were not addressed to any particular individual); Brooks v. North Carolina Dept. of Correction, 984 F.Supp. 940 (E.D.N.C.1977) (words were not personal insults directed at any particular officer); United States v. McDermott, 971 F.Supp. 939 (E.D.Pa.1997) (no evidence that McDermott intended to start a fight by his words and he did not physically resist arrest or engage in a physical *1286 struggle with officers); Commonwealth v. Hock, 556 Pa. 409, 728 A.2d 943 (1999) (Hock's single epithet, uttered in a normal tone of voice while walking away from the officer, did not alarm or frighten him, and there were no bystanders).
¶ 40. While the above cases suggest that a police officer must exercise a higher degree of resistance to fighting words under some circumstances, the cases should not be interpreted to excuse all abusive and profane language directed at law enforcement officers. Indeed:
The fact that police officers ... are trained to deal calmly and authoritatively with disorderly persons does not guarantee that police officers are immune from reacting instinctively in the face of an abusive tirade.
. . .
We may rightly expect that a police officer will act in accordance with his or her training or disciplinary rules. But to fashion from this expectation a judicial rule that relieves a person from the reach of a criminal statute solely because the victim is a police officer is to invite the use of abusive language toward police officers. We do not believe that such a rule is sound in practice or in principle.
State v. Read, 165 Vt. 141, 680 A.2d 944, 950 (1996). Whether speech uttered in the presence of a police officer merits constitutional protection is an issue which should be scrutinized within the factual parameters of each individual case.
¶ 41. In the case sub judice, since the circuit court "affirmed" Brendle's conviction on public profanity, this Court must assume the circuit court found that Brendle uttered the words for which he was accused. Officer Ford testified that Brendle said: "I'm tired of this God d_____ police sticking their nose in s___ that doesn't even involve them." Officer Ford stated in his affidavit that Brendle said the "f-word," but at trial before the circuit court Ford could not remember whether Brendle uttered the "f-word." Officer Ford warned Brendle to cease his use of profanity, but Brendle continued to curse. Not only did Brendle's use of profanity inflict injury by its very utterance, it actually incited an immediate breach of the peace.[6] I disagree with the majority's conclusion that Brendle's words did not constitute "fighting words" as defined by Chaplinsky.
¶ 42. Further, while I acknowledge that speech spoken in the presence of police officers may be constitutionally protected under some circumstances, I do not agree that this is such a case. While Officer Ford might be expected to exercise a higher degree of restraint because of his law enforcement training, he should not be required to expend a herculean effort to endure foul language which is personally directed at him. The U.S. Constitution does not require this Court to condone personally abusive language in the interests of freedom of speech; thus, I respectfully dissent.
¶ 43. Finally, I would affirm Brendle's resisting arrest conviction because the arrest was lawful. The cases cited by the majority which allow a person to use reasonable force to resist an unlawful arrest do not apply to the present case. Those cases condoned a defendant's right to resist a warrantless arrest for a misdemeanor that was not committed in a police officer's presence. In the case sub judice, Brendle committed the offense in Officer Ford's presence. Even if Brendle was subsequently adjudicated not guilty for public profanity, Officer Ford possessed probable cause to make the arrest; therefore, I respectfully dissent to the majority's reversal of Brendle's resisting arrest conviction.
BRIDGES AND PAYNE, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
IRVING, J., CONCURRING IN PART, DISSENTING IN PART:
¶ 44. The majority has done an excellent job in discussing cases which construe *1287 statutes or ordinances prohibiting speech or action designed to provoke a breach of the peace. The objective of the statute under consideration in the case sub judice is not to prohibit speech or action designed to provoke a breach of the peace. Since there is nothing in our statute to warrant a conclusion that its aim is to preserve the peace, I do not believe the holdings of those cases adequately address our fact situation. Further, the majority, while acknowledging Brendle's argument that Miss.Code Ann. § 97-29-47 (Rev.1994) is unconstitutional as applied to him, leaves it unclear whether it is holding the code section unconstitutional on its face or as applied to Brendle, or is holding the statute constitutional to the extent it prohibits profanity which employs fighting words. For reasons which I will articulate in the discussion that follows, I concur with the result reached by the majority but for different reasons.
¶ 45. Brendle was found guilty of public profanity by the Municipal Court of the City of Houston. The Circuit Court of the First Judicial District of Chickasaw County affirmed the judgment of the municipal court. No statutory authority was cited for the offense. However, Mississippi's public profanity statute is Miss.Code Ann. § 97-29-47 (Rev.1994) which says:
If any person shall profanely swear or curse, or use vulgar and indecent language, or be drunk in any public place, in the presence of two (2) or more persons, he shall, on conviction thereof, be fined not more than one hundred dollars ($100.00) or be imprisoned in the county jail nor more than thirty (30) days or both.
¶ 46. As can be seen from the literal language of the statute, it is not profane language that is prohibited. Rather, profanely swearing is prohibited as is cursing and vulgar and indecent language. There is no evidence that Brendle profanely swore or that he swore at all. The question then, it appears to me, is whether Brendle cursed or used vulgar and indecent language, and if so, may the State constitutionally prohibit such language under the circumstances presented.
¶ 47. The majority concludes that the words used by Brendle do not constitute fighting words. I am not sure what words or word the majority has in mind. It spends considerable time talking about whether the "f" word and "d" word, both contained in the affidavit signed by Ford, are profane words. At trial, Ford was not sure whether the "f" word was spoken by Brendle, but he was sure the "d" word and "s" word were spoken as revealed in the following colloquy:
Q. To the best of your recollection and I realize it's been nearly three years ago; but what was the wording that was used in your presence or to you as best you recall that constituted public profanity?
A. To the best of my knowledge the words that was used toward me were, stated from Mr. Brendle were that I'm tired of this God d_____d police sticking their nose in st that doesn't even involve them. That was the profanity that was used toward me.
Q. All right, and was this wording used more than once?
A. Yes, sir, it was. On the first occasion when profanity was used toward me, on the first occasion I did offer a warning at that time. I advised Mr. Brendle that if he continued to use profane language toward me, that he would be charged with public profanity.
On cross-examination, the following was revealed:
Q. Okay, all right. Page one of Exhibit 2 is your affidavit that you signed after the City Court trial alleging what specific profane words he used. What profane words did you remember being used two months after the City Court trial?
A. According to the affidavit?
Q. Yes.
A. God dn, dn, and fk.

*1288 Q. The `F" word, okay.
A. The "F" word, I'm sorry.
Q. And you wrote those on that affidavit.
A. Yes.
Q. Now, after reading those, does that refresh your memory?
Do you remember those things being said?
A. In court?
Q. No, at the scene.
A. To the best of my knowledge, I mean.
Q. Do you remember him using the "F" word?
A. To the best of my knowledge. The first time he cursed me, I remember that plain. The second time, I don't remember the words exactly.
Q. At this point you can't testify under oath that Mr. Brendle used the "F" word; is that correct?
A. At this point in time, no, I can't.
Q. Thank you. Now, the one statement that you do remember he said something about the God dn police coming and getting in my st, or something to that effect.
A. Yes, sir.
¶ 48. As stated, the majority spends much time discussing whether the words used would be considered profane today, only to pretermit a determination on that point. I find unhelpful the majority's discussion of whether the spoken words were profane unless the majority is using profane synonymously with cursing or vulgar and indecent, and if it is using it in that way, then I believe a determination is required by the statute. Also, I would have no difficulty holding that the words used by Brendle are profane, vulgar and indecent. Having said that, I do not conclude, however, that the State may prohibit the speaking of such language in the presence of two or more persons without more.
¶ 49. I agree with the majority that the State may prohibit the utterance of fighting words which may lead to a breach of the peace, but this is not a statute prohibiting the uttering of fighting words so as to preserve the peace. My reading of the statute is that cursing, vulgar and indecent language are prohibited if done in a public place in the presence of two or more persons whether there is a threat of the breach of the peace or not. This construction of the statute is buttressed by the fact that there is no requirement in the statute that the language be directed to either of the individuals present. To illustrate my point, this statute would prohibit vulgar and indecent language uttered by one among two or more friends who are not offended by such utterance, so long as the utterance occurred in a public place. In such an instance, what peace is sought to be preserved? Suppose instead of speaking among friends, one goes to a theater to watch a movie but finds the movie uninteresting, gets up to leave and while doing so employs some choice words that we all could agree would be vulgar, to describe the movie, but the words are not directed to any particular individual. Whether such words were likely to breach the peace would depend upon the sensibilities of the various patrons of the movie. Some probably would be offended, others probably would not and none would likely be driven to fight unless the words were repeatedly voiced so as to interfere with the patrons' enjoyment of the movie. Yet, it is clear to me that the statute would have been violated. Can the State criminalize such conduct without running afoul of the First Amendment? That is the real question posed by the statute in question even though in our case the words were directed to an individual.
¶ 50. As stated, I do not find any of the cases cited by the majority quite on point. In Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the statute in question read: "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name." Id. at 569, 62 S.Ct. 766. The appellant in Chaplinsky was *1289 convicted of violation of the statute by addressing these words to the city marshal: "You are a God d_____ racketeer and a d_____ Fascist and the whole government of Rochester are Fascists or agents of Fascists." Id. at 569, 62 S.Ct. 766. The highest court of New Hampshire had declared the statute's purpose was to preserve the public peace, no words being forbidden except such as have a direct tendency to cause acts of violence by the person to whom, individually, the remark [was] addressed. Id. at 573, 62 S.Ct. 766. The United States Supreme Court upheld the appellant's conviction, finding "the statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace." Id. at 573, 62 S.Ct. 766.
¶ 51. In City of Pontiac v. Klein, 67 Mich.App. 556, 242 N.W.2d 436 (1976), one of the cases cited by the majority, the Michigan Court of Appeals held in a per curiam opinion that one charged under a city ordinance which prohibited the use of "indecent, profane or obscene language in the presence of others" was entitled to a jury instruction that he could not be convicted unless the jury first found that he had uttered "fighting words." Id. at 438. I do not find the decision of the intermediate appellate court of Michigan particularly persuasive because adoption of such a construction, as the majority apparently does in the case sub judice, amounts to a judicial amendment of the statute in question when there is nothing in the statute to suggest or even intimate that the legislature was attempting only to prohibit cursing, vulgar and indecent language that it deemed to be fighting words. Further, as stated, there is nothing in the statute to suggest that the legislature intended the prohibition to apply only when the words were spoken to an individual or individuals. It appears this would be a prerequisite to a finding that any words spoken were "fighting words." I cannot see how words not addressed to anyone in particular can be fighting words.
¶ 52. For the reasons stated, I would hold that the statute is overbroad and therefore, unconstitutional on its face. If we are going to give a restricted construction to the statute as the majority apparently does, I would agree with the dissent by Judge Moore that the words, in the context used by Brendle, constitute "fighting words" although in some other context they might not. That police officers are expected to be able to take more insult than the ordinary citizen does not, in my opinion, raise the threshold for finding the words to be "fighting words," for the standard for judging whether the spoken words are "fighting words" is an ordinary man standard. Chaplinsky, 315 U.S. at 573, 62 S.Ct. 766.
¶ 53. I do not condone the words directed by Brendle toward the officer. These were not words expressed by Brendle with the objective of protesting or showing disagreement with official state conduct or policy. Such speech cannot be criminalized by the states unless the penal statute is narrowly drawn. Although Brendle's comments were directed to a policeman about the policeman's decision to accompany another to Brendle's business to try and resolve a dispute between Brendle and the other, the policeman's action was not taken pursuant to any official city policy, about which any aggrieved citizen has a right to complain. It is speech regarding official government policy and conduct that the Constitution protects despite the speaker's use of words found to be offensive, profane or vulgar in the eyes of others unless it can be said that the speech is likely to incite or invoke a breach of the peace. This is the abiding rationale and reasoning of almost every case cited by the majority. No case, except City of Pontiac, dealt with speech not directed at official government policy. While I fully realize that some speech involving private matters and uttered in public places can be so profane, vulgar or indecent as to be exceedingly offensive to others present, I am unable to find any case that addresses the *1290 constitutional implications of speech in this context.
KING, P.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] It was improper for the circuit court, after at trial de novo, to "affirm" the municipal court's judgment and remand the case for sentencing. Because we are reversing and rendering this case, we need not address the circuit court's error in this regard. Nonetheless, we note that the proper procedure for the circuit court would have been to determine Brendle's guilt or innocence and, if appropriate, sentence him pursuant to the guidelines of the statute under which he was charged.
[2] While the affidavits on file neglect to identify the section of the Mississippi Code under which Brendle was charged for "public profanity," both parties refer to section 97-29-47 as the law under which Brendle was charged.
[3] The statute in question provides that the profanities uttered must be said in a public place and in the presence of two or more persons. However, there is no requirement that two or more persons testify that the vulgar words spoken were actually offensive or that the two present actually heard the words spoken. It seems nonsensical that only one person may testify to the vulgarities uttered and satisfy the elements of the crime. Even if this were an issue in this case, we would be without authority to conclude that the State failed in meeting its burden to establish that the profane words were spoken in the presence of two persons in a public place because penal statutes are to be strictly construed. Midsouth Rail Corp. v. Citizens Bank & Trust Co., Inc., 697 So.2d 451, 458 (Miss.1997). There was no requirement that the State provide more than one person to attest that the vulgar remarks were spoken by the defendant in a public place and in the presence of two or more persons.
[4] The opinion does not state what vulgar language the defendants allegedly used.
[5] In the text of the Orf, the opinion cites to "Sanford v. State" instead of "Stafford v. State." "Stafford" is the correct name for the defendant in that case.
[6] Officer Ford testified that a "tussle" ensued when he attempted to arrest Brendle.